# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____  )
                                         )
BLUE HEN HOTEL, LLC,             )
                                           )    CIVIL ACTION NO.  05-CV-00221 (JJF)
               Plaintiff,            )
                                           )    JURY TRIAL DEMANDED
            v.                    )
                                           )
CHARLES P. ARENA,              )
                                           )
               Defendant.         )
_____  )

## BRIEF OF PLAINTIFF BLUE HEN HOTEL, LLC, IN OPPOSITION TO CHARLES ARENA'S MOTION TO DISMISS

**WHITE AND WILLIAMS LLP**
Frank E. Noyes, II Esquire (#3988)
824 North Market Street – Suite 902
P. O. Box 709
Wilmington, DE  19899-0709
Telephone:  (302) 467-4511

*Of Counsel*
Michael N. Onufrak, Esquire
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
***Attorney(s) for Blue Hen Hotel, LLC***

DOCS_DE 115432v1

**Table of Contents**

I.    NATURE AND STAGE OF THE PROCEEDINGS .........................................1

II.   SUMMARY OF ARGUMENT.................................................................2

III.  CONCISE STATEMENT OF FACTS .................................................3

IV.   ARGUMENT...................................................................................5

     A.    Standard of Review...................................................................5

     B.    Blue Hen's Claim Under the Prompt Payment Act Properly Includes
          All Subcontractors .................................................................5

     C.    Plaintiff's Claim Under the Consumer Protection Act is Proper...........8

          1.   Defendant's Fraudulent Conduct is Not Immunized Because
               He Caused His Company, Arena & Co., Inc., to Breach Its
               Contract With Blue Hen.................................................8

          2.   The Economic Loss Doctrine Does Not Apply to This Case ......11

          3.   The Consumer Fraud Act Explicitly Applies to Fraud In
               Connection with Services .............................................13

V.    Conclusion......................................................................................14

DOCS_DE 115432v1

# Table of Authorities

## <u>Cases</u>

*Brandywine Mushroom Company v. Hockessin Mushroom Products, Inc.*,
    682 F. Supp. 1307 (D. Del. 1988)...........................................................................9

*Conley v. Gibson*,
    355 U.S. 41 (1957)..................................................................................................5

*Danforth v. Acorn Structures*,
    608 A.2d 1194 (Del. 1992) ...................................................................................12

*East River SS. Corp. v. Transamerica Delaval, Inc.*,
    476 U.S. 858 (1986)..............................................................................................12

*E.I. DuPont de Nemours & Co. v. Great Lakes Chem. Corp.*,
    2005 U.S. Dist. LEXIS 17478 (D. Del. 2005) ......................................................5

*Frazier v. Am. Airlines, Inc.*,
    2004 U.S. Dist. LEXIS 19875 (D. Del. 2004) ....................................................11

*Friendly Ice Cream Corp. v. Andrew E. Mitchell & Sons, Inc.*,
    340 A.2d 168 (Del. Super. 1975)...........................................................................7

*Hishon v. King &* Spalding,
    467 U.S. 69 (1984)..................................................................................................5

*Iotex Communications, Inc. v. Defries*,
    1998 Del. Ch. LEXIS 236 (Del. Ch. 1998) .........................................................11

*Jordan v. Fox,* Rothschild, *O'Brien & Frankel*,
    20 F.3d 1250 (3d Cir. 1994) ..................................................................................5

*Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co.*,
    2005 Del. Super. LEXIS 57 (Del. Super. Ct. 2005) ....................................... 10-11

*Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz*
    *of North America, Inc.*, 558 A.2d 1066 (Del. Super. 1989)..................................14

*Pinkert v. John J. Olivieri, P.A.*,
    2001 U.S. Dist. LEXIS 8133 (D. Del. May 24, 2001)......................................9, 10

*Roofmasters, Inc. v. The Robino-Ladd Company*,
    1975 Del. Ch. LEXIS 238 (Del. Ch., June 12, 1975) .............................................8

*State of Delaware v. Pierson*,
    86 A.2d 559 (1952) .................................................................................................8

*State of Delaware v. Tabasso Homes, Inc.*,
    42 Del. 110, 28 A.2d 248 (Del. 1942) ...................................................................8

*Sturm v. Clark*,
    835 F.2d 1009 (3d Cir. 1987) .......................................................................5

### Statutes

6 Del. Code § 1301 ...........................................................................................1

6 Del. Code §2511(4) ...................................................................................1, 13

6 Del. Code § 2512 .........................................................................................14

6 Del. Code § 2513 ...........................................................................1, 2, 8, 12, 13

6 Del. Code §3501 et seq. ..................................................................................1

6 Del. Code §3502 .......................................................................................2, 5, 6

6 Del. Code § 3503 .......................................................................................5, 6

DOCS_DE 115432v1

# I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Blue Hen Hotel, LLC filed this action against Charles P. Arena, asserting three causes of action under Delaware law against the defendant individually, arising out of his conduct as sole owner of a company, C. Arena & Co., Inc., which was liquidated in August 2004 under chapter 7 of the U.S. Bankruptcy Code.  Count I of the Complaint asserts a claim under the Delaware Prompt Payment Act, 6, Del. Code § 3501 et seq. Count II asserts a claim under the Delaware Consumer Fraud Act, 6 Del. Code § 2513 et seq.  Count III asserts a claim under the Delaware Fraudulent Conveyance Act, 6 Del. Code § 1301.

Defendant Arena filed a motion to dismiss challenging some of the allegations in count I, and all of  count II.  Arena does not challenge count III.  Defendant has not challenged either subject matter jurisdiction, which is established in ¶ 4 of the Complaint, or personal jurisdiction of this Court over defendant, who is a resident of Pennsylvania.

## II.    SUMMARY OF ARGUMENT

Defendant's assertion that the Prompt Payment Act (PPA), 6 Del. Code § 3502, only imposes duties on him against subcontractors with whom Arena & Co. had a direct contractual relationship is not supported by the single case he cites, and is directly contrary to the explicit intent and purpose of the PPA.

Defendant's assertion that Blue Hen's claim under the Consumer Fraud Act (CFA), 6 Del. Code § 2513 et seq., is barred by the fact that Arena & Co. had a contractual relationship with Blue Hen is based on an incorrect reading of the allegations in the Complaint, and an incorrect application of the case law applying the CFA.  Blue Hen had a contract with Arena & Co, not with Charles Arena.  Likewise, Plaintiff's CFA claim is not barred by the economic loss doctrine, which applies to tort claims, not to statutory causes of action.  Further, contrary to defendant's claim, the CFA specifically includes claims involving services, which are included in the statutory definition of "merchandise."

## III.    CONCISE STATEMENT OF FACTS

Plaintiff Blue Hen Hotel, LLC entered into a construction management contract with C. Arena & Co., Inc. in connection with a hotel to be built in Newark, Delaware. Compl., ¶ 8.  The contract imposed some very specific duties on Arena & Co. with regard to payment applications during the construction process.  Under paragraph 11.3 of the contract, Arena & Co. was required to submit payment applications to Blue Hen on a monthly basis, which enumerated the costs and work performed, not only of Arena & Co. itself, but also the costs and work performed of every subcontractor.  Compl., ¶10.  Blue Hen was obligated, in turn, to pay Arena & Co. for all properly billed work and costs, and once Arena & Co. received payment, it was obligated to pay each subcontractor "within 5 working days after Contractor receives payments from Owner for the Subcontractor's work." *Id*.  This obligation, on its face, applied to ***all*** subcontractors, regardless of whether they contracted directly with Arena & Co., or contracted with a subcontractor.

Arena & Co. promised Blue Hen it would forward the funds to the subcontractors, and after Arena received the subcontractor payments, it misrepresented to Blue Hen that those funds were paid to subcontractors as required:

> Arena & Co. submitted sworn certifications to Blue Hen on each monthly payment application that Arena & Co. had paid subcontractors for all work performed to date, for which payment was requested and received from Blue Hen. On the basis of those certifications, Blue Hen included in its payments to Arena & Co., substantial amounts to reimburse Arena & Co. for payments Arena & Co. claimed were owed to Arena & Co.'s subcontractors.

Compl., ¶ 12.  However, the money Arena & Co. received to pay subcontractors, in many cases, was never paid to any subcontractor.  *Id*.  Arena & Co., which was placed into chapter 7 liquidation proceedings during the hotel project, Compl., ¶ 18, kept over

$675,000 of funds that Blue Hen paid to it specifically for work performed by subcontractors. Compl. ¶ 13.

Count II of the Complaint asserts a cause of action under the Consumer Fraud Act as follows:

> 32.    The payment applications were presented to Blue Hen by Arena & Co. with the intent to induce reliance on false or misleading statements concerning payments to subcontractors, in violation of the Consumer Fraud Act, 6 Del. C. § 2513.

> 33.    Defendant Arena used deception, fraud, false pretense, false promises, misrepresentations, or the concealment, suppression, or omission of material facts with intent that Blue Hen rely upon such concealment, suppression or omission, in order to induce Blue Hen to pay substantial sums requested by payment application on behalf of subcontractors with the intent to divert those funds to other purposes, including payments to Arena personally.

> 34.    Blue Hen reasonably and justifiably relied on the intentionally false certifications executed by Arena personally, or at his request.  As a result of Arena's fraudulent certifications, Blue Hen incurred liability directly to subcontractors for the same amounts it already paid to Arena & Co.

This count adequately pleads a cause of action under the Consumer Fraud Act.

## IV.    ARGUMENT

### A.    Standard of Review

The standard by which a Motion to Dismiss is reviewed has been often repeated

by this Court:

> The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir. 1987). In reviewing a motion to dismiss for failure to state a claim, "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Sturm*, 835 F.2d at 1011; *see also Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). A court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Jordan*, 20 F.3d at 1261.

*E.I. DuPont de Nemours & Co. v. Great Lakes Chem. Corp.*, 2005 U.S. Dist. LEXIS

17478, 5-6 (D. Del. 2005).

### B.    Blue Hen's Claim Under the Prompt Payment Act Properly Includes All Subcontractors

The Delaware Prompt Payment Act (PPA), 6 Del. Code §3502, declares that "**<u>All</u>**

**<u>moneys or funds</u>** received by a contractor in connection with a contract . . . for additions

to a building . . . shall be trust funds in the hands of the contractor."  (emphasis added).

Section 3503, in turn, states that:

> No contractor, or agent of a contractor, shall pay out, use or appropriate any monies or funds described in §3502 of this title until they have first been applied to the payment of the full amount of **<u>all moneys due and owing by the contractor</u>** to all persons . . . (emphasis added)

Defendant Arena asserts that the obligations of the contractor under the PPA are limited to subcontractors that have a direct contractual relationship with Arena & Co.  Therefore, Arena argues, Arena owed no duty under the PPA to "second tier" or "third tier" subcontractors.  This argument fails on several levels.

First, Arena's argument misreads the plain language of §3603.  Arena argues that the phrase highlighted above requires contractual privity.  However, having a direct subcontract is not the only basis on which money can be "due and owing by the contractor" to a subcontractor, and it is not the basis on which Blue Hen alleges that Arena is liable under the PPA.  The Complaint asserts that Arena & Co. owed money to subcontractors because Blue Hen paid Arena & Co. money for subcontractors (based on Arena & Co.'s requests and certifications), which money is held as "trust funds" by Arena & Co. under §3602.   Arena & Co. promised Blue Hen it would pay all moneys received on behalf of subcontractors to those subcontractors "within 5 working days."  Compl., ¶10.  Further, Arena & Co. falsely stated to Blue Hen that it had paid such moneys to the subcontractors, each time it submitted another monthly payment application. [1]

In addition, Arena's argument misreads the Complaint, because in ¶ 10 of the Complaint Blue Hen alleges that Arena & Co. owed Blue Hen a ***contractual obligation*** to submit payment applications from subcontractors along with its own payment applications, and pay the money owed to subcontractors "'within 5 working days after

---

[1]  Note that Arena does not challenge the applicability of the PPA to him individually. The PPA clearly imposes duties on both the contractor and the "agent of the contractor." In addition, the Complaint asserts that Blue Hen is entitled to pierce the corporate veil of Arena & Co. in order to assert claims that Blue Hen has directly against Charles Arena. Compl. ¶¶ 17, 23-24.

Contractor receives payment from Owner for the Subcontractor's work.'"  Complaint, ¶ 10 (quoting Agreement, §11.3).  Thus, Arena & Co. had an affirmative obligation under its Agreement with Blue Hen to promptly pay all subcontractor payments that were included in Arena & Co.'s payment application.[2]

Arena relies on a single 1975 Superior Court decision to assert that the Prompt Payment Act does not create any duties running from general contractors to indirect subcontractors, *Friendly Ice Cream Corp. v. Andrew E. Mitchell & Sons, Inc.*, 340 A.2d 168 (Del. Super. 1975).  However, *Friendly Ice Cream* does not support defendant's position.  In that case, the general contractor, Carr, received payment from the owner, Friendly Ice Cream, and passed along to the first-tier subcontractor, Mitchell, funds due and owing to a second tier subcontractor, Aronow.  The owner, Friendly Ice Cream, asserted that Carr had a duty under the PPA to make sure that Mitchell in turn passed the funds along to Aronow.  The Court rejected this assertion.

Unlike the general contractor in *Friendly Ice Cream*, Arena & Co. did <u>not</u> pass such funds along to any subcontractor.  Rather, Arena & Co. kept those funds, but continued to submit payment applications falsely certifying that it paid the subcontractors.  Compl., ¶ 12.  This precise conduct was labeled as "unconscionable" by

---

[2]  Even though this requirement was stated in the Agreement between Arena and Blue Hen, all such subcontractors would have third party beneficiary rights to enforce Arena's obligation to pay them once Arena had been paid.  But, of course, those subcontractors did not need to assert a third party beneficiary action against Arena & Co., because they had statutory mechanic's lien actions that they could and did assert against Blue Hen. Compl. ¶ 14.

the Court of Chancery.[3]  The PPA is intended to protect owners and subcontractors in

construction-related contracts.

> [T]he objects and purposes of the Statute are (1) to protect
> the owner against the claims of subcontractors where the
> owner has made payment to the general contractor, and (2)
> to give subcontractors protection against misappropriation
> of funds by general contractors.

*State of Delaware v. Pierson*, 86 A.2d 559, 560 (1952) (citing *State of Delaware v.*

*Tabasso Homes, Inc.*, 42 Del. 110, 28 A.2d 248 (Del. 1942)).  For Arena to argue that

withholding subcontractor payments and lying about that to Blue Hen is not covered by

the PPA is directly contrary to the intent and effect of the PPA.

> **C.    Plaintiff's Claim Under the Consumer Protection Act is Proper**

Defendant challenges Count II of the Complaint, which asserts a cause of action

under the Delaware Consumer Fraud Act (CFA), 6 Del. Code § 2513 et seq., on three

grounds, all of which are without merit.  First, defendant asserts that the CFA does not

apply to his fraudulent conduct because his misrepresentations arose out of the

contractual relationship between his company and Blue Hen.  Second, defendant asserts

that the economic loss doctrine trumps the specific statutory rights created by the CFA

and prohibits any recovery in tort for damages that are purely economic in nature.  Third,

defendant claims that the CFA only applies to misrepresentations in connection with the

sale of "merchandise."

> **1.    Defendant's Fraudulent Conduct is Not Immunized Because**
> **He Caused His Company, Arena & Co., Inc., to Breach Its**
> **Contract With Blue Hen**

---

[3] *Roofmasters, Inc. v. The Robino-Ladd Company*, 1975 Del. Ch. LEXIS 238 (Del. Ch.,
June 12, 1975), slip op. at *6 (attached) ("It is thus unconscionable in my opinion to
permit a contractor to divert funds intended for application to labor and material to its
own use.")

Defendant's first argument relating to the Consumer Fraud claim is that no such action can be maintained when the claim arises entirely from a breach of contract. This assertion, based primarily on *Pinkert v. John J. Olivieri, P.A.*, 2001 U.S. Dist. LEXIS 8133 (D. Del. May 24, 2001), is wrong for several reasons.[4]

First, the *Pinkert* case has a limited holding based on distinguishable facts. In that case, the Court addressed the specific scenario in which the claim being asserted as a CFA claim was "based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law." *Id.* at *5. In that scenario, the Court held that when asserting against a party to a contract arising from a contractual duty, the plaintiff "must sue in contract and not in tort." *Id.*

In this case, Arena's actions are not based entirely on breach of contract. Rather, they arise also from Arena's independent duty owed to Blue Hen under the Prompt Payment Act.[5] In addition, unlike this case, the CFA claim in *Pinkert* was asserted directly against the company with whom the plaintiff had a contract. In contrast, Blue Hen contracted with Arena & Co., not defendant Charles Arena individually. It was Arena & Co. that had the contractual duty to provide payment applications and pay the subcontractors. However, Arena & Co. is not the defendant, Charles Arena is.[6] While

---

[4] A copy of the *Pinkert* case is attached to the Brief of defendant Charles Arena.

[5] In addition, defendant Arena, as an officer of a corporation can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is an actual participant in the tort. *Brandywine Mushroom Company v. Hockessin Mushroom Products, Inc.*, 682 F. Supp. 1307, 1311 (D. Del. 1988). This "participation" theory is specifically asserted in ¶ 24 of the Complaint.

[6] Arena & Co. no longer exists – Charles Arena sought and obtained liquidation of the company through chapter 7 of the Bankruptcy Code, Compl., ¶ 18, so Blue Hen cannot sue Arena & Co. for breach of contract or anything else.

Arena & Co.'s failure to pay subcontractors does constitute a breach of contract by Arena & Co., it does not give rise to a breach of contract cause of action against Charles Arena.

The *Pinkert* decision is also distinguishable because the alleged misrepresentations in that case went to "the nature of the work" performed. The plaintiff in *Pinkert* alleged that the defendant contractor's work was not "in accordance with general industry standards," *id*., slip op. at 4, so that each time the contractor requested another payment, it "misrepresented the nature of its work." *Id*. slip op. at 5. The Court concluded that such misrepresentations (the nature of the work) were "some of the . . . principal obligations under their agreement with plaintiffs." *Id*. Here, the claim does not involve the quality of the work of Arena & Co., but rather the specific factual misrepresentation that that money held it trust was paid to subcontractors. This is not a case where the fraud claims essentially state a claim of negligent work.

Second, the *Pinkert* Court's application of the rule that contract claims should not be "bootstrapped" into fraud claims is broader than most prior cases, in a way that is not appropriate or justified in this case. Generally, cases stating this rule (including the cases cited in *Pinkert*) are more limited in their sweep:

> As a general rule under Delaware law, where an action is based <u>entirely</u> on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort. In both *Pinkert v. Olivieri*, 2001 U.S. Dist. LEXIS 813 (D. Del. 2001), and *Tristate Courier and Carriage, Inc. v. Berryman*, 2004 Del. Ch. LEXIS 43, *11 (Del. Ch. 2004), the Delaware courts held that a breach of contract claim could not be "bootstrapped into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform."

- 10 -

*Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co.,* 2005 Del. Super. LEXIS 57, 9-10 (Del. Super. 2005) (attached). *See also Frazier v. American Airlines, Inc.*, 2004 U.S. Dist. LEXIS 19875 (D. Del. 2004) (attached) (rejecting an attempt to allege <u>fraudulent inducement</u> to enter into a contract under the CFA).

In *Iotex Communications, Inc. v. Defries*, 1998 Del. Ch. LEXIS 236, at *5 (Del. Ch. 1998), also cited by Arena and in the *Pinkert* decision, the court held that a breach of contract claim "cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform."[7] In fact, the formulation of this "bootstrapping" rule in *Iotex* specifically allows for claims of fraud based on contractual promises when "the promise was collateral or extraneous to the terms" of the contract. *Id.* at *6 (quoted in Plaintiff's Brief, at 5). The fraud in this case is not fraud in the inducement, nor is it a fraudulent promise, it is misrepresentations of fact made by Arena & Co. concealing the fact that Arena & Co. was pocketed money that was supposed to go to subcontractors. The fraud alleged in this case did not occur at the time the contract was entered into, on July 22, 2002 (Compl., ¶ 8), but rather much later, when Arena & Co. submitted sworn certifications on monthly payment applications. Compl., ¶ 12. The CFA claim in this case is not an attempt to "bootstrap" an contract claim, and is properly asserted under the CFA.

### 2.    The Economic Loss Doctrine Does Not Apply to This Case

Defendant also asserts that Blue Hen's claim under the Delaware Consumer Fraud Act is barred by the economic loss doctrine. The economic loss doctrine applies to tort claims, not statutory claims such as count II, which is brought under the Consumer Fraud

---

[7] A copy of the *Iotex* opinion is attached to the Brief of defendant Charles Arena.

Act, 6 Del. Code § 2513.  Defendant can cite no authority that would support a finding that the economic loss doctrine overrides this specific statutory remedy.

The single case Arena cites does not consider the effect of the economic loss rule on statutory claims under the CFA.  *Danforth v. Acorn Structures*, 608 A.2d 1194, 1195 (Del. 1992).  In that case, the only claim that the Court found to be subject to the economic loss doctrine was a negligence claim.  *Id.* at 1195.  Further, the case law from around the country that the Court in *Danforth* reviewed also did not encompass statutory causes of action.  Nor do the policies and rationale for the economic loss doctrine that were expressed in that opinion apply to consumer fraud claims.  *Id.* at 1196 (contrasting tort law, which "protects the individual and his property from the risk of physical harm," with contract-warranty law, which protects "bargained-for expectations . . . when a product fails to meet the qualitative expectations of a consumer").  Likewise, the danger foreseen by the *Danforth* Court by allowing claims for purely economic loss outside of contract law – that such claims "could make a manufacturer liable for vast sums of money," and could expose it to liability that cannot be anticipated, *id.* at 1197-98 – simply do not apply.  The Consumer Fraud Act is by no means a license to overreach and prey upon businesses unfairly.  And such dangers are not even remotely applicable here.[8]

As the Supreme Court in *Danforth* acknowledged, the economic loss doctrine is a "judicially created doctrine."  *Danforth*, 608 A.2d at 1195.  Defendant has not cited any

---

[8]  In addition, the cases applying the economic loss doctrine consider only tort claims and contract-warranty claims.  *See Danforth*, 608 A.2d at 1197 (discussing *East River SS. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986)).  The entire analysis is based solely on a choice between negligence and strict liability theories versus contract-warranty theories, not statutory fraud claims.  *Id.* at 1196-97.  That construct necessarily assumes that where the economic loss rule applies, the plaintiff has a contract based cause of action.

authority to suggest that such common law should be interpreted to limit the plain terms of a statutory remedy created by the Delaware legislature. The economic loss rule should not be applied to this case.

### 3.    The Consumer Fraud Act Explicitly Applies to Fraud In Connection with Services

Finally, defendant claims that the CFA does not apply to this case at all because Arena & Co.'s fraudulent payment applications were not connected to any sale of merchandise. However, the CFA defines the term "merchandise" to mean "any objects, wares, goods, commodities, intangibles, real estate *or services*." 6 Del. Code §2511(4) (emphasis added). The duty of Arena & Co. under the construction management contract to submit payment applications to Blue Hen for all subcontractors, and forward all funds paid by Blue Hen to the respective subcontractors, clearly fall within this definition.

Further, contrary to Arena's strained and narrow interpretation, the CFA is not limited to misrepresentations made at the time Arena & Co. submitted its big for the construction management contract. This is clear from the plain language of the CFA. Under §2513, the CFA prohibits any deception or misrepresentation made "in connection with the sale . . . of any merchandise." Since "merchandise" includes "services," the CFA applies to misrepresentations made in connection with the sale of services. The Complaint clearly alleges that misrepresentations in this case were made in the payment applications, which were submitted for the purpose of being paid by Blue Hen. The payments were made by Blue Hen for services provided by Arena & Co. and

its subcontractors.  The exchange of services identified in the payment applications for payment self-evidently constitutes the sale of services.[9]

The sole case cited for Arena's argument involves allegations arising from the sale of an automobile, for which the only transaction alleged to fall under the CFA was the original sale itself.  *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of North America, Inc.*, 558 A.2d 1066, 1074 (Del. Super. 1989).[10]  Yet, as Arena himself acknowledges, the agreement between Arena & Co. and Blue Hen "required payment by Blue Hen for services *as they were performed*."  Defendant's Brief at 7 (emphasis added). The obligation to pay did not arise until the services were performed; by any practical understanding of the term "sale," that is when the services were sold to Blue Hen.

## V.    CONCLUSION

For the reasons set forth above, plaintiff Blue Hen Hotel, LLC requests that the Motion to Dismiss part of Count I and all of Count II should be denied.

**WHITE AND WILLIAMS LLP**

By: _____

FRANK E. NOYES, II (#3988)
824 North Market Street – Suite 902
P. O. Box 709
Wilmington, DE  19899-0709
Telephone:  (302) 467-4511

*Attorney(s) for Blue Hen Hotel, LLC*

<u>*Of Counsel*</u>
Michael N. Onufrak, Esquire
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

---

[9]  To the extent this application of the CFA is anything other than self-evident, the CFA itself requires that its provisions be "liberally construed."  6 Del. Code § 2512.
[10]  This opinion is inadvertently identified as a Supreme Court decision in Arena's Brief.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

_____  )
                                   )
BLUE HEN HOTEL, LLC,               )
                                   )   CIVIL ACTION NO.  05-CV-00221 (JJF)
            Plaintiff,             )
                                   )   JURY TRIAL DEMANDED
        v.                         )
                                   )
CHARLES P. ARENA,                  )
                                   )
            Defendant.             )
_____  )


**ORDER**

AND NOW, this _____ day of _____, 2005, upon consideration of Defendant

Charles Arena's Motion to Dismiss, and the Response of Plaintiff Blue Hen Hotel, LLC,

it is hereby

ORDERED that the Motion is denied.

BY THE COURT:


_____
FARNAN, U.S.D.J.

# EXHIBIT A

LEXSEE 2005 U.S. DIST. LEXIS 17478

**E.I. DUPONT DE NEMOURS AND COMPANY, Plaintiff, v. GREAT LAKES CHEMICAL CORPORATION, Defendant.**

**Civil Action No. 04-1452 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 17478*

**August 22, 2005, Decided**
**August 22, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, holder of a U.S. patent (the '727 patent) alleged that defendant, holder of U.S. patent ('053), infringed the '727 patent. Before the court was defendant's motion to dismiss the amended complaint under *Fed. R. Civ. P. 12(b)(1)*, (6), or, in the alternative, to stay any remaining counts, pending contractually required completion of mediation.

**OVERVIEW:** The parties filed applications to patent methods of extinguishing fires using a chemical compound known as HFC-227. In 1994, the parties decided to enter into a cross-license agreement relating to its manufacture and use. In 2002, the parties signed a modified version of the 1994 agreement which, inter alia, contained mechanisms for the resolution of disputes. Besides Count I for infringement, the complaint sought, in Count II, a declaratory judgment that plaintiff did not infringe defendant's '053 patent. Count III asserted breach of contract due to defendant's alleged termination of plaintiff's rights under the agreements. Applying the *Fed. R. Civ. P. 12(b)(6)* standard, the court concluded that if plaintiff were to prove all of its allegations, it could prevail on its breach of contract claim. Regarding Count II, the court considered defendant's Rule 12(b)(1) factual challenge to jurisdiction, and determined that a reasonable apprehension of suit did not exist. Thus, no actual controversy supported jurisdiction under the Declaratory Judgment Act. As for Count I, the court concluded that if plaintiff were to prove all of its allegations, it could prevail on its infringement claim.

**OUTCOME:** The motion was granted in part and denied in part. Counts I and III were not dismissed. Count II was dismissed. The court denied defendant's motion with regard to the issues of ripeness. Further, the court denied defendant's motion with regard to staying the action pending completion of mediation pursuant to the Federal Arbitration Act.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN1] A motion to dismiss under *Fed. R. Civ. P. 12(b)(1)* challenges the jurisdiction of a court to address the merits of the plaintiff's complaint. The motion should be granted where the asserted claim is insubstantial, implausible, foreclosed by prior decisions of the court, or otherwise completely devoid of merit as not to involve a federal controversy. Additionally, a motion to dismiss under Rule 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN2] The purpose of a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* is to test the legal sufficiency of a complaint. In reviewing a motion to dismiss for failure to state a claim, all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party. A court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

2005 U.S. Dist. LEXIS 17478, *

[HN3] When a court considers a factual challenge to jurisdiction, it does not presume the truth of plaintiff's allegations. Further, the existence of disputed material facts will not preclude the court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff has the burden of proof that jurisdiction does in fact exist.

*Civil Procedure > Remedies > Declaratory Relief
Constitutional Law > The Judiciary > Case or Controversy
Patent Law > Jurisdiction & Review > Subject Matter
Jurisdiction > Declaratory Judgment Actions*

[HN4] *28 U.S.C.S. § 2201*(a) of the Declaratory Judgment Act requires an actual controversy between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment. The inquiry as to whether there exists an actual controversy focuses on the conduct of both the patentee and the potential infringer. There must be both (1) an explicit threat or other action by the patentee which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit; and (2) present activity by the declaratory judgment plaintiff which could constitute infringement, or concrete steps taken with the intent to conduct such activity. When the defendant's conduct, including its statements falls short of an express charge, one must consider the totality of the circumstances in determining whether that conduct meets the first prong of the test. The plaintiff must be able to demonstrate that it has a reasonable apprehension of imminent suit. This requirement of imminence reflects the mandate in U.S. Const. art. III that an injury in fact be concrete, and actual or imminent, not conjectural or hypothetical.

**COUNSEL:** [*1] Richard L. Horowitz, Esquire and David E. Moore, Esquire of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware. Of Counsel: Bruce D. DeRenzi, Esquire and John T. Gallagher, Esquire of MORGAN & FINNEGAN, LLP, New York, New York, for Plaintiff.

Frederick L. Cottrell, III, Esquire and Alyssa M. Schwartz, Esquire of RICHARDS LAYTON & FINGER, Wilmington, Delaware. Of Counsel: Richard D. Harris, Esquire, Brad R. Bertoglio, Esquire, and Jordan Herzog, Esquire of GREENBERG TRAURIG LLP, Chicago, Illinois, for Defendant.

**JUDGES:** FARNAN, District Judge.

**OPINIONBY:** Joseph J. Farnan Jr.

**OPINION:**

**MEMORANDUM OPINION**

August 22, 2005
Wilmington, Delaware

**FARNAN, District Judge.**

Pending before the Court is the Motion To Dismiss Dupont's Amended Complaint Or, In The Alternative, To Stay Any Remaining Counts, Pending The Contractually Required Completion Of Mediation (D.I. 10) filed by Defendant Great Lakes Chemical Corporation ("Great Lakes"). For the reasons discussed, the motion will be granted in part and denied in part.

**BACKGROUND**

Both Plaintiff E.I. DuPont de Nemours and Company ("Dupont") and Great Lakes filed patent applications with the U.S. Patent and Trademark [*2] Office seeking to patent methods of extinguishing fires using a chemical compound known as HFC-227. The parties subsequently decided to enter into a cross-license agreement relating to the manufacture and use of HFC-227. On June 24, 1994, the parties entered into a license agreement ("the 1994 Agreement"), wherein DuPont agreed to grant Great Lakes an exclusive license to Dupont's *U.S. Patent No. 5,084,190* ("the '190 patent"), while Dupont reserved a right to manufacture, use, or sell HFC-227 pursuant to the *'190 patent* in the Unites States. In return, Great Lakes agreed to grant DuPont a nonexclusive license in the United States pursuant to Great Lakes' *U.S. Patent No. 5,124,053* ("the '053 patent"). Great Lakes also agreed to pay Dupont a royalty comprising a percentage of the difference between the selling price of Great Lakes' HFC-227 product and the price paid to DuPont for the purchase of raw materials to manufacture it.

On May 8, 2002, the parties signed a modified version of the 1994 Agreement ("the 2002 Agreement"), wherein the license grant from DuPont to Great Lakes was changed to a nonexclusive license, and the license grant from Great Lakes to DuPont was expanded in scope [*3] to a worldwide license. The 2002 Agreement also contained a reciprocal "anti-strikeback" provision prohibiting the parties from asserting patents against each other. Further, the 2002 Agreement contained mechanisms for the resolution of disputes under the Agreement.

In mid-November 2004, DuPont filed this lawsuit alleging that Great Lakes infringes *U.S. Patent No. 6,376,727* ("the '727 patent"). The *'727 patent* is directed to an azeotropic mixture of HFC-227 and hydrogen fluoride, which DuPont alleges is necessarily produced by the process Great Lakes uses to manufacture HFC-227. In response, on December 8, 2004,

Great Lakes sent DuPont a seven-page letter in which Great Lakes gave Dupont formal notification of Dupont's breach of both the 1994 and 2002 Agreements. In Great Lakes' view, DuPont breached Article II(B)(2) of the 1994 and 2002 Agreements, which prohibits DuPont from assert any of its patents to prevent Great Lakes from manufacturing, using, or selling the HFC-227 product. Sixty-one days later, on February 7, 2005, DuPont filed an Amended Complaint, adding two additional counts. Count II seeks a declaratory judgment that Dupont does not infringe Great Lakes' *'053 patent*. [*4] Count III is for breach of contract due to Great Lakes' alleged termination of DuPont's rights under the 1994 and 2002 Agreements.

On March 1, 2005, Great Lakes filed its Motion To Dismiss Dupont's Amended Complaint, Or In The Alternative, To Stay Any Remaining Counts, Pending The Contractually Required Completion of Mediation (D.I. 10). By its Motion, Great Lakes moves the Court, pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*, to dismiss each count of DuPont's Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. In the alternative, Great Lakes moves the Court, pursuant to the *Federal Arbitration Act* and the express contractual terms of the 2002 Agreement, to stay the lawsuit pending the completion of negotiation and mediation as to all counts not so dismissed.

## STANDARDS OF LAW

### I. Dismissal Pursuant To Rule 12(b)(1)

[HN1] A motion to dismiss under *Rule 12(b)(1)* challenges the jurisdiction of the court to address the merits of the plaintiff's complaint. The motion should be granted where the asserted [*5] claim is "insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Coxson v. Comm. of Pennsylvania, 935 F.Supp. 624, 626 (W.D. Pa. 1996)* (citations omitted). Additionally, a motion to dismiss under 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. See *Mortensen v. First Fed. Sav. and Loan, 549 F.2d 884, 891 (3d Cir. 1977)*.

### II. Dismissal Pursuant To Rule 12(b)(6)

[HN2] The purpose of a motion to dismiss pursuant to *Rule 12(b)(6)* is to test the legal sufficiency of a complaint. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; *Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987)*. In reviewing a motion to dismiss for failure to state a claim, "all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Sturm, 835 F.2d at 1011*; see also *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)*. A court may dismiss [*6] a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)*; *Jordan, 20 F.3d at 1261*.

## DISCUSSION

### I. Whether The Court Should Dismiss Count III, Breach Of Contract Pursuant to Rule 12(b)(6)

Great Lakes contends that Count III of the Amended Complaint, breach of contract, should be dismissed pursuant to *Rule 12(b)(6)* for three reasons. First, Great Lakes contends that it has not terminated DuPont's rights under the 2002 Agreement by sending its letter of December 8, 2004. n1 Second, Great Lakes contends that DuPont's allegations contradict one another. Specifically, Great Lakes contends that it is inconsistent for DuPont to assert that Dupont did not breach the Agreements, yet assert that DuPont's rights under the agreement have been terminated. Third, Great Lakes contends that DuPont's claim for breach of contract is premature because Great Lakes' accusation of breach in the December 8 letter does not, in and of itself, constitute a breach by Great Lakes.

> n1 In pertinent part, Article VII (b) of the 2002 Agreement states:
>
>> Termination for Breach. In the event that any provision of this Agreement is breached by either Party (Breaching Party), the Non-breaching party may give written notice of its intention to terminate this Agreement ("the Notice") to the Breaching Party, setting forth in detail the breach and the steps required to correct the breach. If such breach is corrected within the sixty (60) day period following receipt of the notice, the rights granted and obligations assumed herein shall continue in force. If such breach is not corrected within the sixty (60) day period following receipt of the Notice, all rights in the

Agreement of the Breaching
Party will be terminated as of the
last day of said sixty (60) day
period.

(D.I. 11, Ex. Bat 8.) The Agreement goes on to
specify the consequences of termination of the
Agreement.

[*7]

In response, DuPont contends that it properly
pleaded its breach of contract cause of action because
DuPont alleges (1) the existence of the 2002 Agree-
ment; (2) the facts underlying Great Lakes' claim of
breach of and intent to terminate that Agreement,
which resulted in the termination fo DuPont's rights;
and (3) resulting damages and right to injunctive relief.

Applying the standard for dismissal pursuant to
*Rule 12(b)(6)* to the Amended Complaint, the Court
concludes that if DuPont were to prove all of its allega-
tions, it may be able to prevail on its breach of contract
claim. Thus, the Court will deny Great Lakes' motion
with regard to dismissing Count III of the Amended
Complaint.

## II. Whether The Court Should Dismiss Count II, Declaratory Judgment, Pursuant To Rule 12(b)(1)

Great Lakes contends that Count II, declaratory
judgment, should be dismissed for two reasons. First,
Great Lakes contends that Count II should be dis-
missed pursuant to *Rule 12(b)(1)* for lack of subject
matter jurisdiction because no actual, justiciable con-
troversy exists between the parties. Second, Great
Lakes contends that Count II should be dismissed pur-
suant to *Rule 12(b)(6)* because it [*8] fails to state a
claim upon which relief can be granted.

A. Whether Count II Should Be Dismissed Pursuant to
Rule 12(b)(1) for Lack of Subject Matter Jurisdiction

The Court concludes that the instant case presents
a factual challenge because Great Lakes disputes the
existence of the jurisdictional facts alleged in the Com-
plaint. [HN3] When a court considers a factual chal-
lenge to jurisdiction, it does not presume the truth of
plaintiff's allegations. *Mortensen v. First Federal Sav.
and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)*.
Further, the existence of disputed material facts will
not preclude the court from evaluating for itself the
merits of jurisdictional claims. Id. Moreover, the plain-
tiff has the burden of proof that jurisdiction does in fact
exist. Id.

Great Lakes contends that DuPont has no reason-
able apprehension of suit, as the 1994 and 2002
Agreements comprise an implied covenant not to sue.
Specifically, Great Lakes contends that because Great
Lakes has not terminated the 1994 and 2002 Agree-
ments and DuPont denies that DuPont has breached the
Agreements, the 1994 and 2002 Agreements remain an
implied covenant not to sue. Further, Great Lakes [*9]
contends that it has never made any explicit threat of
suit and that, even if DuPont lost its rights to the *'053
patent*, the absence of a patent license is not sufficient
to establish in DuPont a reasonable apprehension of
suit.

In response, Dupont contends that, by asserting
that DuPont's filing of the Complaint constituted a
breach of the 2002 Agreement and indicating its intent
to terminate DuPont's rights under the Agreement,
Great Lakes caused DuPont's loss of rights to the *'053
patent*. Further, DuPont contends that a reasonable
apprehension of suit arose because DuPont did not
change its activity concerning HFC-227 upon termina-
tion of its rights under the Agreement.

[HN4] The Declaratory Judgment Act, *28 U.S.C. §
2201(a)*, "requires an actual controversy between the
parties before a federal court may exercise jurisdiction
over an action for a declaratory judgment." *EMC Corp.
v. Norand Corp., 89 F.3d 807, 810 (Fed. Cir. 1996)*.
The inquiry as to whether there exists an actual contro-
versy focuses on the conduct of both the patentee and
the potential infringer. *Gen-Probe, Inc. v. Vysis, Inc.,
359 F.3d 1376, 1380 (Fed.Cir.2004)*. [*10] There
must be both (1) an explicit threat or other action by
the patentee which creates a reasonable apprehension
on the part of the declaratory judgment plaintiff that it
will face an infringement suit; and (2) present activity
by the declaratory judgment plaintiff which could con-
stitute infringement, or concrete steps taken with the
intent to conduct such activity. *Id.; Amana Refrigera-
tion, Inc. v. Quadlux, Inc., 172 F.3d 852, 855 (Fed.
Cir. 1999); BP Chems. Ltd. v. Union Carbide Corp., 4
F.3d 975, 978 (Fed. Cir. 1993)*.

The parties do not dispute that the second prong,
present infringing activity, of the two-part test is satis-
fied in these circumstances. Rather, the motion turns on
the first prong, reasonable apprehension of suit. "When
the defendant's conduct, including its statements falls
short of an express charge, one must consider the 'total-
ity of the circumstances' in determining whether that
conduct meets the first prong of the test." *Arrowhead
Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731,
736 (Fed. Cir. 1988)* (quoting *Goodyear Tire & Rub-
ber Co. v. Releasomers, Inc., 824 F.2d 953, 955 (Fed.
Cir. 1987))*. [*11] DuPont must be able to demonstrate
that it has a reasonable apprehension of imminent suit.

*Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101, 140 L. Ed. 2d 210, 118 S. Ct. 1003 (1998)* (this requirement of imminence reflects the mandate in Article III of the U.S. Constitution that an injury in fact be "concrete," and "actual or imminent, not conjectural or hypothetical.").

The Court concludes that DuPont has not demonstrated a reasonable apprehension of imminent suit. At the time DuPont filed its Amended Complaint, Great Lakes had taken no action other than to send the December 8 letter notifying DuPont that Great Lakes considered DuPont to be in breach of the contract. On the sixth page of its December 8 letter, Great Lakes warns DuPont that unless it dismisses this lawsuit, "Great Lakes will have no choice but to address DuPont's breach of the cross-license agreements. Article VII (b) of the 2002 Agreement entitles Great Lakes to seek all damages incurred as a result of DuPont's breaches." (D.I. 11, Ex. F at 6.) Great Lakes goes on to enumerate how it believes it has been harmed by Dupont's breach, but makes no mention of infringement as a source of its injury. (Id.) Nothing in the December [*12] 8 letter leads the Court to believe that Great Lakes was contemplating asserting the *'053 patent* against DuPont. Further, the Court finds that there exists a question of fact as to whether Great Lakes intended to terminate the Agreements at the time it sent the December 8 letter. If Great Lakes did not intend to terminate the Agreements, Great Lakes would be bound by the Agreements not to assert the *'053 patent* against Du-Pont. Further, DuPont presents no evidence that Great Lakes has made any indication of its intent to enforce the *'053 patent* against any other party. In these circumstances, the Court concludes that a reasonable apprehension of suit does not exist. Therefore, no actual controversy supports jurisdiction under the *Declaratory Judgment Act* for DuPont's declaratory judgment claim against Great Lakes with regard to the *'053 patent*. Accordingly, the Court will dismiss Count II of the Amended Complaint for lack of subject matter jurisdiction.

### III. Whether The Court Should Dismiss Count I, Patent Infringement, For Failure To State A Claim

Great Lakes contends that, because the subject matter of the 1994 and 2002 Agreements is HFC-227 and patents directed to its [*13] uses and compositions, the "anti-strikeback" provisions in the Agreements preclude DuPont from asserting the *'727 patent* against Great Lakes over any process for manufacturing HFC-227. n2

n2 Article II(b) (2) of the 2002 Agreement states:

> So long as Great Lakes is not in default with respect to any payment by Great Lakes hereunder, DuPont will not assert; . . . any patent or patent application now or hereafter controlled (in the sense of having the right to grant licenses or sublicenses) by Du-Pont to prevent Great Lakes or its Customers from inporting, exporting, manufacturing, using and/or selling Product as provided by the grant of Article II (a).

(D.I. 11, Ex. B at 3.)

In response, DuPont contends that the provisions of the 2002 Agreement do not bar DuPont from Asserting the *'727 patent* against Great Lakes. Specifically, DuPont contends that the plain language of the 2002 Agreement prohibits DuPont only from asserting a patent to "prevent" Great Lakes from manufacturing, using, or selling fire [*14] extinguishing compositions comprising HFC-227 and that the parties expressly agreed that "no license or right is granted by implication or otherwise" to any Dupont patent except as specified in the 2002 Agreement.

Applying the standard for dismissal pursuant to *Rule 12(b)(6)* to the Amended Complaint, the Court concludes that if DuPont were to prove all of its allegations, it could prevail on its infringement claim. Thus, the Court will not dismiss Count I of the Amended Complaint.

### IV. Whether the Court Should Stay Or Dismiss This Lawsuit Pending Completion Of Mediation

Great Lakes first contends that because DuPont has failed to engage in mandatory third party mediation prior to filing this action, DuPont's claims have been brought prematurely and should be dismissed pursuant to the ripeness doctrine. Alternatively, Great Lakes contends that this action should be stayed, pursuant to the Federal Arbitration Act, until Dupont first negotiates and then mediates with Great Lakes with regard to all claims raised in the Amended Complaint. Specifically, Great Lakes contends that the Federal Arbitration Act applies to the alternative dispute resolution procedure in the 2002 Agreement [*15] n3 and that all

2005 U.S. Dist. LEXIS 17478, *

claims raised within the Amended Complaint are subject to mediation pursuant to the FAA.

n3 Article XIV of the 2002 Agreement states:

Dispute Resolution. In the event of any dispute or disagreement between the parties concerning the provisions of this Agreement, the dispute, upon written request of either party, shall be referred to the representatives of the parties for decision. Those representative shall meet in good faith to resolve the dispute. If, after thirty (30) days, the Parties' representatives cannot resolve the dispute, then the parties agree that they will submit to a third party mediation in a mutually acceptable location. Only upon a failed mediation as determined by either Party will either Party be free to consider court intervention.

(D.I. 11, Ex. Bat 10.)

In response, DuPont contends that the unambiguous language of the Article XVI (C) of the Agreement contains two conditions precedent that must be satisfied prior to resolving a dispute by mediation. First, a written [*16] request must be made by either party to have party representatives attempt to resolve the dispute. Second, if after 30 days the representatives are unsuccessful in resolving the dispute, then the matter is submitted to non-binding third party mediation.

After reviewing the pertinent Article of the 2002 Agreement, the Court concludes that in these circumstances, the agreement to mediate was not triggered. The plain language of Article XVI (C) states that the parties agree they will submit to third party arbitration after 30 days have elapsed without a resolution by representatives of the parties. However, neither party made a written request to initially refer the dispute to representatives of the parties for decision, as required by the language of the Article. Accordingly, the Court will deny Great Lakes' motion with regard to the issues of ripeness. Further, the Court will deny Great Lakes' motion with regard to staying this action pending completion of mediation pursuant to the Federal Arbitration Act.

**CONCLUSION**

For the reasons discussed, the Motion To Dismiss Dupont's Amended Complaint Or, in The Alternative, To Stay Any Remaining Counts, Pending The Contractually Required [*17] Completion Of Mediation (D.I. 10) filed by Great Lakes will be granted in part and denied in part.

An appropriate Order will be entered.

**ORDER**

At Wilmington, this 22 of August 2005, for the reasons set forth in the Memorandum Opinion issued this date,

NOW THEREFORE, IT IS HEREBY ORDERED that the Motion To Dismiss Dupont's Amended Complaint Or, In The Alternative, To Stay Any Remaining Counts, Pending The Contractually Required Completion Of Mediation (D.I. 10) filed by Great Lakes is **GRANTED with regard to Count II of the Amended Complaint (D.I. 5) and DENIED** in all other respects.

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

# EXHIBIT B

LEXSEE 1975 DEL. CH. LEXIS 238

**Roofmasters, Inc. v. The Robino-Ladd Company.**

**C.A. 4764.**

**COURT OF CHANCERY OF THE STATE OF DELAWARE**

*1975 Del. Ch. LEXIS 238*

**June 12, 1975.**

**NOTICE:** [*1]   Unreported Decision

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff owner filed an action against defendant contractor to recover funds associated with furnished labor and materials to the contractor as a general contractor within the meaning of *Del. Code Ann. tit. 6, § 3501(1)*. The owner sought a preliminary injunction in conformity with the restraining order. The contractor filed a motion to dissolve the restraining order and dismiss the complaint.

**OVERVIEW:** The owner and the contractor entered into a contract for the construction of a number of housing projects. The owner claimed that the contractor received funds and moneys from corporations, which held themselves out to be the actual owners of such building projects, but the contractor had not remitted to the owner its share of such funds. The owner obtained a temporary restraining order that restrained the contractor from transferring, using, disbursing, or expending any money or funds that would reduce the contractor's assets. The contractor argued that the funds it received in connection with the projects were received by it in its capacity as owner and not as a contractor. The court found that the owner dealt with the contractor with the understanding that it was the contractor and not an alleged owner though subsidiary corporations. However, there were no inferences to be drawn from the present record that would indicate misappropriation. The owner failed to demonstrate a reasonable probability of ultimate success at a final hearing on the issue of misappropriation.

**OUTCOME:** The owner's application for the entry of a preliminary injunction was denied, and the contractor's motion to dissolve the temporary restraining order was granted. However, the contractor's motion to dismiss the complaint was denied.

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Conditions & Provisions*

[HN1] When an owner of land enters into a contract for the erection of a building it is understood that such contractors must arrange either for sub-contractors or for labor and material. There springs into existence an implied agency of the contractor for the owner to obtain the necessities for the building, and upon this theory of agency rests the right of sub-contractor, laborer or materialmen to obtain direct liens upon the property of the owner. It has been said that these liens by persons having no direct contractual relation with the owner are somewhat akin to an attachment or garnishment of the fund in the owner's hands with the property as security.

*Real & Personal Property Law > Liens > Mechanics' Liens*

[HN2] When an owner contracts for the erection of a building all subcontractors, laborers or materialmen engaged in such building operation can, as we have seen, obtain direct liens against the property. For the prevention of these liens all funds paid to the contractor on account of the erection may be said to constitute trust funds for the payment of claims that could materialize into liens, The statute has for its object both the protection of the owner whose property, by reason of the implied agency of the contractor, may be made liable for sub-contracts, labor or material furnished for the building, and to give additional protection to the sub-contractors, laborers or materialmen engaged upon the building.

*Real & Personal Property Law > Liens > Mechanics' Liens*

[HN3] *Del. Code Ann. tit 6, § 3501* provides: (1) "Contractor" includes, but is not limited to, an architect, engineer, real estate broker or agent, subcontractor or other person, who entered into any contract with another per-

son for the erection, construction, completion, alteration or repair of any building or for additions to a building, by such contractor, or, for the sale to such other person of any lands and premises, whether owned by such contractor or another, upon which such contractor undertakes to erect, construct, complete, alter or repair any building or addition to a building.

*Real & Personal Property Law > Liens > Mechanics' Liens*

[HN4] *Del. Code Ann. tit 6, § 3501* provides in part: (2) "Moneys or funds" includes, but is not limited to, the entire amount of all moneys or funds received by a contractor, as defined in this section, who, being the owner of the legal title to lands and premises, receives, in connection with a contract for the sale thereof and for the erection, construction, completion, alteration or repair of any building or addition thereon by such contractor, any moneys or funds by way of a loan or advance upon the security of such lands and premises for the purpose of such erection, construction, completion, alteration or repair, or who receives from the other contracting party or vendee any deposit or sum of money on account of the purchase or contract price and no part of such moneys or funds shall be deemed or construed applicable to the payment of the cost or selling price of land, unless that part of the contract price or selling price applicable to cost or selling price of land, be specifically so stated in the contract.

*Real & Personal Property Law > Liens > Mechanics' Liens*

[HN5] *Del. Code Ann. tit 6, § 3504* provides in part: Contractor's failure to use or apply money in accordance with § 3503. Failure of a contractor, or of an agent of a contractor, to pay or cause to be paid, in full or pro rata, the lawful claims of all persons, firms, association of persons or corporations (including surveyors and engineers), furnishing labor or material (including fuel), as required by § 3503 of this title, within 30 days after the receipt of any moneys or funds for the purposes of § 3502 of this title, shall be prima facie evidence of the payment, use or appropriation of such trust moneys or funds by the contractor in violation of the provisions of this chapter.

**OPINIONBY:**

    MARVEL

**OPINION:**

    The complaint herein alleges that the defendant to which plaintiff allegedly furnished labor and materials in the former's capacity as a general contractor within the meaning of *6 Del. C. § 3501(1)* for the construction of a number of housing projects described in the complaint herein, has allegedly received funds and moneys from corporations which held themselves out to be the actual owners of such building projects but has not remitted to plaintiff its due share of such funds. Plaintiff contends that such funds accordingly constitute a trust fund in the hands of the defendant as provided for under the provisions of *6 Del. C. § 3502* and that defendant has improperly "* * * paid out, used or appropriated [such] money or funds * * *" *6 Del. C. § 3503*.

    Plaintiff further alleges that demand has been made upon the defendant for payment for services rendered and materials furnished the aggregate sum owing and due being in the claimed amount of $ 26,901 and that such account remains outstanding and unpaid.

    On March 31, 1974, this Court, after hearing argument [*2] on plaintiff's application for a temporary restraining order, entered an order restraining the defendant"... from transferring, using, disbursing, or expending any money or funds which would reduce [its] assets below an amount necessary to satisfy [plaintiff's] claim."

    Plaintiff seeks the granting of a preliminary injunction in conformity with the outstanding restraining order, while defendant has moved for an order dissolving the restraining order and dismissing the complaint, contending that the funds received by it in connection with the above projects were received by it in its capacity as owner and not as a contractor, contending that the provisions of *6 Del. C. §§ 3501* et seq. are, therefore inapplicable and that a trust should not be imposed over any such funds, Bruce Bartron, assistant secretary of the defendant, averring that Robino-Ladd is allegedly the owner of each of the projects through its wholly-owned subsidiaries, with the exception of Linden Green II, which is admittedly owned jointly with Gilpin Van Trump and Montgomery, Inc. by virtue of defendant's partnership interest in a limited partnership.

    Mr. Bartron goes on to aver that [*3] plaintiff's charges have not been paid because of the fact that defendant has not only suffered damages as a result of leaks in a roof that the plaintiff built for the Chateau Towers project, but it is further contended that plaintiff is liable to it for damages sustained to the roof on the Valley Run Towers project during a severe windstorm in April, 1975. Plaintiff seeks preliminary injunctive relief on the basis of the provisions of *6 Del. C. §§ 3501* et seq., which provide for criminal sanctions in a case such as the one at bar.

    The first question to be answered is, therefore what is the underlying purpose of *6 Del. C. §§ 3501* et seq. and secondly may its purposes be served in a civil action. Compare *Stewart v. The Travelers Corporation 502 F.2d 108 (9th Cir. 1974)*.

1975 Del. Ch. LEXIS 238, *

In *State v. Tobasso Homes, Ct. of Gen Sess., 28 A.2d 248 (1942)* the court set forth the basic purposes of the statute stating:

[HN1] "When an owner of land enters into a contract for the erection of a building it is understood that such contractors [*4] must arrange either for subcontractors or for labor and material. There springs into existence an implied agency of the contractor for the owner to obtain the necessities for the building, and upon this theory of agency rests the right of sub-contractor, laborer or materialmen to obtain direct liens upon the property of the owner. It has been said that these liens by persons having no direct contractual relation with the owner are somewhat akin to an attachment or garnishment of the fund in the owner's hands with the property as security. 36 Am.Jur. 21.

It is this fact of agency of the contractor for the owner that furnishes much of the purpose and reason of the present statute. [HN2] When an owner contracts for the erection of a building all subcontractors, laborers or materialmen engaged in such building operation can, as we have seen, obtain direct liens against the property. For the prevention of these liens all funds paid to the contractor on account of the erection may be said to constitute trust funds for the payment of claims that could materialize into liens, The statute has for [*5] its object both the protection of the owner whose property, by reason of the implied agency of the contractor, may be made liable for sub-contracts, labor or material furnished for the building, and to give additional protection to the subcontractors, laborers or materialmen engaged upon the building."

In *State v. Pierson, Del. Supr., 86 A.2d 559 (1952)* the court went on to say that one of the statute's primary purposes is to give "* * * subcontractors protections against misappropriation of funds by general contractors." And the New Jersey Supreme Court in *Hiller v. Skoglund, Inc. v. Atlantic Creosoting Co., 190 A.2d 380 (1962)* stated:

"A court should not hesitate to translate [the] legislative conception ... [of the trust fund] ... into a positive duty and to compel the appropriate use of payments where the payee knows their source and obviously intended purpose ... For a court to do less would be to sanction sharp practice-indeed unmoral conduct-in the business community. ... The law ought to be based on people, especially those regularly engaged in business, doing the proper and conscionable thing." Practical considerations also militate in [*6] favor of the granting of equitable relief. In other words, the person least likely to be able to afford delay in obtaining full payment for completed work is the sub-contractor. Labor must be paid for as it is performed or there will probably be a

walk out. It is thus unconscionable in my opinion to permit a contractor to divert funds intended for application to labor and materials to its own use. Reliance upon criminal prosecution and sanctions may not fully effectuate the policy of the state to prohibit such conduct. Civil sanctions provide a more expeditious means of regulating such conduct. I am therefore of the opinion that *6 Del. C. § § 3501* et seq. may serve as the basis for the relief here sought. See also Maull v. stokes, *Del. Ch., 68 A.2d 200 (1949).*

Defendant contends, however, that it is not a contractor within the meaning of *6 Del. C. § 3501(1),* n1 and in support of this contention cites *State v. Tobasso Homes, supra,* for the proposition that a contractor-owner is not within the intended reach of the statute, the point being that one may not logically misappropriate one's own funds. [*7] The defendant grounds its claim to ownership on the basis of its ownership of the projects through its wholly-owned subsidiaries.

n1 [HN3] § 3501. Definitions as used in this chapter:

(1) "Contractor" includes, but is not limited to, an architect, engineer, real estate broker or agent, subcontractor or other person, who entered into any contract with another person for the erection, construction, completion, alteration or repair of any building or for additions to a building, by such contractor, or, for the sale to such other person of any lands and premises, whether owned by such contractor or another, upon which such contractor undertakes to erect, construct, complete, alter or repair any building or addition to a building.

Plaintiff, in reply, argues that the defendant should not be allowed to evade the responsibilities and obligations that it undertook in its contracts with plaintiff by creating separate corporate entities and then seeking to pierce the corporate veil.

It appears clear that plaintiff dealt with the defendant with the understanding that it was the contractor and [*8] not an alleged owner though subsidiary corporations. n2 In other words, reliance by plaintiff upon § § 3501 et seq. for protection in addition to that obtainable under the Delaware Mechanics Lien Law, *25 Del. C. § § 2701* et seq., was, in my opinion, justified. See *State v. Tobasso Homes, supra.*

n2 See *Buechner v. Farbenfabriken Bayer Aktiengesell, Del. Supr., 154 A.2d 684, 687*

*(1959); Martin v. D. B. Martin Co., Del. Ch., 88 A. 612, 614 (1913).*

Defendant goes on to argue that in any event no funds or moneys have in fact been received by it within the meaning of *6 Del. C. § 3501(2)*, n3 and that no showing has thus been made of any misappropriation of funds by it. In reply, plaintiff relies on *6 Del. C. § 3504* n4 as bearing on defendant's failure to pay his bill within thirty days after receipt of funds as prima facie evidence of misappropriation. Defendant justifies its failure to pay plaintiff's bill because of allegedly poor workmanship on plaintiff's part resulting in damages to defendant.

n3 [HN4] § 3501. Definitions. As used in this chapter:

(2) "Moneys or funds" includes, but is not limited to, the entire amount of all moneys or funds received by a contractor, as defined in this section, who, being the owner of the legal title to lands and premises, receives, in connection with a contract for the sale thereof and for the erection, construction, completion, alteration or repair of any building or addition thereon by such contractor, any moneys or funds by way of a loan or advance upon the security of such lands and premises for the purpose of such erection, construction, completion, alteration or repair, or who receives from the other contracting party or vendee any deposit or sum of money on account of the purchase or contract price and no part of such moneys or funds shall be deemed or construed applicable to the payment of the cost or selling price of land, unless that part of the contract price or selling price applicable to cost or selling price of land, be specifically so stated in the contract.

n4 [HN5] § 3504. Contractor's failure to use or apply money in accordance with § 3503.

Failure of a contractor, or of an agent of a contractor, to pay or cause to be paid, in full or pro rata, the lawful claims of all persons, firms, association of persons or corporations (including surveyors and engineers), furnishing labor or material (including fuel), as required by § 3503 of this title, within 30 days after the receipt of any moneys or funds for the purposes of § 3502 of this title, shall be prima facie evidence of the payment, use or appropriation of such trust moneys or funds by the contractor in violation of the provisions of this chapter.

[*9]

However, such presumption, in my opinion, is not at this stage, sufficient to establish clearly and convincingly

an urgent need for the granting of interim equitable relief in the form of a preliminary injunction. No showing of actual dishonesty as opposed to suspicion of dishonesty has been demonstrated on the present record. In short, the inferences to be drawn from the present record give no indication of misappropriation. In other words, plaintiff has not demonstrated a reasonable probability of ultimate success at final hearing on the issue of misappropriation.

However, the pendency of this case serves, of course, as notice to the mortgage lender and Chateau Towers, Inc. that they should exercise caution in the actual distribution of any funds to be paid out in connection with the housing projects in issue.

Plaintiffs' application for the entry of a preliminary injunction will be denied and defendant's motion to dissolve the temporary restraining order granted. Finally, inasmuch as I am of the opinion that plaintiff has pleaded a cause of action cognizable in a court of equity, defendant's motion to dismiss the complaint will be denied.

Order on notice.

# EXHIBIT C

LEXSEE 2005 DEL. SUPER. LEXIS 57

**MIDLAND RED OAK REALTY, INC. AND MRO SOUTHWEST, INC. Plaintiffs, v. FRIEDMAN, BILLINGS & RAMSEY & CO., INC. AND VELASCO GROUP, L.L.C. Defendants.**

**C.A. No. 04C-05-091 CLS**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*2005 Del. Super. LEXIS 57*

**November 15, 2004, Submitted**
**February 23, 2005, Decided**

**NOTICE:** [*1]  THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Motion To Dismiss DENIED IN PART; GRANTED IN PART.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a broker and a consulting group, filed a Del. Super. Ct. R. Civ. P. 12(b)(6) motion to dismiss the claims filed by plaintiffs, a real estate investment firm and a realty corporation, alleging willful conduct or gross negligence, fraud, and negligence.

**OVERVIEW:** The firm entered into a three-year financing contract. The firm was required to pay the principal balance and a $ 5,275,000 exit fee when the agreement expired in 2002. In 2001, the firm began searching for financing to replace the initial contract. The firm chose the broker to finance piece B and another company to finance piece A. If both pieces were refinanced prior to the expiration of the original contract, the exit fee was to be waived. Ultimately, the contract expired without financing for piece B. The trial court found that the fraud and negligence counts had to be dismissed because the firm could not recover in tort for breach of contract. The fraud and negligence claims were based entirely on obligations owed by the broker under the agreement. The broker did not violate any common law duty independent of the financing contract terms. The firm sufficiently pleaded the willful conduct or gross negligence cause of action although the firm's complaint did not use the term willful. Because willful and wanton each referred to a distinct state of mind, they only had to be averred generally pursuant to Del. Super. Ct. R. Civ. P. 9(b).

**OUTCOME:** The motion was granted with regard to the fraud and negligence counts against the broker. The motion was denied with regard to the willful misconduct or gross negligence counts against the broker. The motion was denied with regard to the fraud, negligence, and agency counts against the consulting group.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] Delaware has clear standards for granting a Del. Super. Ct. R. Civ. P. 12(b)(6) motion to dismiss. A court must accept all well-pled allegations as true. The court must then apply a broad sufficiency test: whether a plaintiff may recover under any reasonable conceivable set of circumstances susceptible of proof under the complaint.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN2] In the context of a Del. Super. Ct. R. Civ. P. 12(b)(6) motion to dismiss, dismissal will not be granted if the complaint gives general notice as to the nature of the claim asserted against a defendant.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN3] In the context of a Del. Super. Ct. R. Civ. P. 12(b)(6) motion to dismiss, a complaint will not be dismissed unless it is clearly without merit, which may be

2005 Del. Super. LEXIS 57, *

either a matter of law or of fact. Vagueness or lack of detail, standing alone, is insufficient to dismiss a claim.

***Contracts Law > Contract Interpretation > Interpretation Generally***

[HN4] In Delaware, the principles governing contract interpretation are well settled. Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning.

***Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem***

[HN5] If the parties disagree as to the proper interpretation of a contract, the disagreement does not automatically create an ambiguity. Instead, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.

***Contracts Law > Breach > Causes of Action***
***Torts > Negligence > Negligence Generally***

[HN6] As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort.

***Contracts Law > Breach > Causes of Action***
***Torts > Business & Employment Torts > Deceit & Fraud***

[HN7] A breach of contract claim cannot be bootstrapped into a fraud claim merely by adding the words "fraudulently induced" or alleging that the contracting parties have never intended to perform.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements***

[HN8] See Del. Super. Ct. R. Civ. P. 9(b).

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements***

[HN9] Willful and wanton each refer to a "distinct state of mind." Accordingly, willful and wanton need only be averred generally as required in Del. Super. Ct. R. Civ. P. 9(b).

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements***

[HN10] In the context of Del. Super. Ct. R. Civ. P. 9(b), the term aver implies that there must be at least a positive assertion of the state of mind.

***Civil Procedure > Jury Trials > Province of Court & Jury***

***Torts > Negligence > Negligence Generally***

[HN11] Generally, the issue of whether facts and circumstances amount to willful conduct or gross negligence is a fact question for the jury.

***Civil Procedure > Jury Trials > Province of Court & Jury***
***Torts > Negligence > Negligence Generally***

[HN12] It is a matter of law that when the conduct in question falls short of gross negligence, a case is entirely free from doubt, and no reasonable jury could find gross negligence.

***Torts > Negligence > Negligence Generally***

[HN13] Willful conduct has been defined as a "conscious indifference" or "I don't care" attitude which is the prerequisite of wanton behavior. Wanton conduct is a conscious indifference to consequences in circumstances where the probability of harm to another within the circumference of the conduct is reasonably apparent, although harm to such others in not intended.

***Contracts Law > Contract Interpretation > Good Faith & Fair Dealing***

[HN14] The concept that a covenant of good faith and fair dealing is implied in a contractual relationship is well accepted in Delaware. Good faith has been defined as faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.

***Torts > Vicarious Liability > Agents***
***Torts > Vicarious Liability > Independent Contractors***

[HN15] Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. On the other hand, if the agent is an independent contractor, and the employer does not retain control over him, the employer is not liable for the independent contractor's negligent actions.

**COUNSEL:** Attorneys for Plaintiffs Midland Red Oak Realty, Inc. and MRO Southwest, Inc.: Jonathan L. Parshall, Esquire, Murphy Spadaro & Landon, Wilmington, Delaware, Shawn L. Raymond, Esquire, J. Hoke Peacock III, Esquire, Susman Godfrey LLP, Houston, Texas.

Attorneys for Defendant Friedman, Billings & Ramsey, Co., Inc.: Arthur G. Connolly, III, Esquire, Connolly Bove Lodge & Hutz, LLP, Wilmington, Delaware, Howard W. Gutman, Esquire, William B. Pittard, IV, Esquire, Williams & Connolly LLP, Washington, D.C.

Attorneys for Defendant Velasco Group, L.L.C.: Judith M. Kinney, Esquire, Reed Smith, Wilmington, Delaware,

2005 Del. Super. LEXIS 57, *

Richard C. Sullivan, Jr., Esquire, Anne M. Devens, Esquire, Falls Church, Virginia.

**JUDGES:** Calvin L. Scott, Jr., Judge.

**OPINIONBY:** Calvin L. Scott, Jr.

**OPINION:**

    **ORDER**

**SCOTT, J.**

    I. Facts

    In this action, Plaintiffs Midland Oak Realty, Inc. and MRO Southwest, Inc. ("MRO") are suing Defendants Friedman, Billings, Ramsey & Co., Inc. ("FBR") and Velasco Group, L.L.C. ("Velasco") [*2] over a real-estate financing contract. MRO is a Delaware corporation with its principal office in Midland, Texas. FBR is a Delaware corporation with its principal office in Arlington, Virginia. Velasco is a limited liability Virginia corporation.

    MRO is a real-estate investment firm engaged in buying, developing, and managing undervalued commercial properties in Texas, Oklahoma, and Arizona. In June 1999, MRO entered into a three-year financing contract with Lehman Brothers. The financing was to cover fifteen properties. MRO was required to pay the principal balance and a $5.275 million exit fee when the credit facility expired on July 1, 2002.

    During the summer of 2001, MRO began to search for financing to replace the Lehman contract. MRO was put in touch with FBR to discuss possible financing options. In the beginning of 2002, MRO also interviewed other financing consultants. Ultimately, MRO chose FBR and Holliday Fenoglio Fowler ("Holliday") to discuss financing options. MRO informed each of the firms that it needed to re-finance before the Lehman contract expired. FBR and Holliday suggested that the financing be split into an "A" piece and a "B" piece in order to optimize financing. [*3]

    FBR made its pitch to MRO on January 28, 2002. Jeff McClure, then vice-president of FBR, made several representations to MRO. He first stated that FBR had expertise in real estate financing, specifically, it was their specialty and they knew the market "better than anyone." McClure also represented to MRO that $24 million was a reasonable amount for financing of the "B" piece. McClure was confident in "B" piece financing. He suggested that MRO find the cheapest price for the "A" piece.

    In February, 2002, MRO assigned the "B" piece to FBR and the "A" piece to Holliday. MRO told Lehman

about the re-financing effort. Lehman agreed in front of a Velasco representative to waive the $5.275 million fee if MRO re-financed the "A" and "B" pieces before the Lehman contract expired. While FBR had already begun work on financing, its contract with MRO had not been signed. The contract was not signed until May 6, 2002. The terms of engagement specified that FBR would find financing on "a best efforts basis."

    Holliday secured financing for the "A" piece with Greenwich Corporate Products. FBR, however, had not found financing as of April, 2002. In mid-April, McClure left FBR to start his own [*4] consulting group, Velasco. FBR assured MRO that McClure departure would not affect the "B" piece financing.

    At a May 1, 2002 status conference between MRO, FBR and Holliday, FBR notified the parties that it had enlisted the help of Velasco to obtain financing. MRO was not a party to this contract. McClure attended the meeting on behalf of Velasco and stated that "I have the deal done" in regard to the "B" piece. MRO informed Velasco that a Texas financier, Smith Brownlie, wanted to underwrite the transaction, but would need at least sixty days. McClure responded that the "B" piece was done, and did not need Brownlie's money.

    On June 4, 2002, Holliday, Velasco, FBR, and MRO met in Texas. Brownlie was also present. Brownlie asked McClure about the status of the "B" piece. McClure responded that he had not finalized any financing. In addition, he stated that MRO's "B" piece financing was "in good shape." Brownlie became agitated because he had wished to finance the project but was told that the financing was already completed. Velasco and FBR indicated to MRO after the meeting that they had sent several proposals to different sources.

    When asked to provide evidence of potential financers, [*5] Velasco provided MRO and Holliday with a list of people not regularly in the real estate finance market. This caused MRO and Holliday to be alarmed. A lack of pitch book for the real estate financing also alarmed MRO. When Velasco finally did produce offers they had received for the "B" piece, MRO realized that they were well below the price needed to replace the Lehman contract. FBR assured MRO that "the deal would get done" and "not to worry."

    Ultimately, the Lehman contract expired without financing for the "B" piece. Holliday had tried at the last minute to obtain financing, but was unsuccessful. As a result of not obtaining re-financing, MRO became in default to Lehman. Subsequently, MRO and Lehman entered into a forbearance agreement. MRO has liquidated the vast majority of its portfolio holdings.

    II. Standard of Review

[HN1] Delaware has clear standards for granting a Rule 12(b)(6) Motion to Dismiss. The Court must accept all well-pled allegations as true. n1 The Court must then apply a broad sufficiency test: "whether a plaintiff may recover under any reasonable conceivable set of circumstances susceptible of proof under the complaint." n2 [HN2] Dismissal will not be granted if the [*6] complaint "gives general notice as to the nature of the claim asserted against the defendant." n3 Further, [HN3] a complaint "will not be dismissed unless it is clearly without merit, which may be either a matter of law or of fact." n4 "Vagueness or lack of detail," standing alone, is insufficient to dismiss a claim. n5

n1 *Spence v. Funk, 396 A.2d 967, 968 (Del. Supr. 1978).*

n2 *Id.* (Internal citation omitted).

n3 *Diamond State Tel. Co. v. Univ. of Delaware, 269 A.2d 52, 58 (Del. Supr. 1970).*

n4 *Id.*

n5 *Id.*

III. Discussion

In determining how to rule on the Motion, this Court must look to the contract between FBR and MRO. FBR contends that the contract language permits recovery only for "willful misconduct or gross negligence." It is their position that the Motion to Dismiss should be granted because MRO has failed to plead either willful misconduct or gross negligence in their First Amended Complaint. MRO counters that the Motion should [*7] not be dismissed because the indemnity provision does not apply until this Court issues a final ruling on the merits.

The Indemnity Provision of the FBR/MRO contract states in pertinent part:

> The Company agrees to indemnify and hold harmless FBR and its affiliates . . . and their respective directors, officers, employees, agents and controlling persons . . . The Company will not be liable to any Indemnified Party under the foregoing indemnification and reimbursement provisions . . . to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from FBR's *willful misconduct or gross negligence.* (emphasis added) . . .

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to or arising out of this engagement of FBR pursuant to, or the performance by FBR of the services contemplated by, this Agreement except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent [*8] jurisdiction to have resulted primarily from FBR's *willful misconduct or gross negligence.* (emphasis added).

A. *Plain Meaning Rule*

[HN4] In Delaware, the principles governing contract interpretation are well settled. n6 "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning." n7 [HN5] If the parties disagree as to the proper interpretation of the contract, the disagreement does not automatically create an ambiguity. n8 Instead, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." n9

n6 *Northwestern Nat'l Ins. Co., v. Esmark, Inc., 672 A.2d 41, 43 (Del. Supr. 1995).*

n7 *Id.* (Internal citation omitted).

n8 *Id.*

n9 *Id.* (citing *Rhone-Poulenc Basic Chemicals Co., Inc. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. Supr. 1992)).*

[*9]

In the case *sub judice,* the express language of the FBR/MRO agreement reserves Plaintiff's right to deny indemnification to Defendant if a court has rendered a final judgment holding that FBR acted with willful misconduct or gross negligence. By employing the Plain Meaning Rule, this Court agrees with MRO that a determination of indemnification cannot be made with respect to the parties, on at least a few of the claims, until after this case has gone to trial and been decided.

### B. Recovery of Breach of Contract in Tort Law

FBR asserts that Counts III and IV must be dismissed against them because a plaintiff may not recover in tort for breaches of contract agreements. This Court agrees.

[HN6] "As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." n10 In both *Pinkert v. Olivieri* and *Tristate Courier and Carriage, Inc. v. Berryman*, n11 the Delaware courts held that [HN7] a breach of contract claim could not be "bootstrapped into a fraud claim merely by adding the words 'fraudulently induced' [*10] or alleging that the contracting parties never intended to perform." n12

> n10 *Pinkert v. Olivieri, 2001 U.S. Dist. LEXIS 8133, 2001 WL 641737 *5 (D. Del. 2001).*

> n11 *2004 Del. Ch. LEXIS 43, 2004 WL 835886 *11 (Del. Ch. 2004).* (Internal citation omitted).

> n12 *Pinkert, 2001 U.S. Dist. LEXIS 8133, 2001 WL 641737 at *5*; *Tristate Courier and Carriage, Inc., 2004 Del. Ch. LEXIS 43, 2004 WL 835886 at *11.*

MRO's claims of Fraud and Negligence are based entirely on obligations owed by FBR under the contractual agreement. The alleged material misrepresentations made by FBR are not collateral issues in this case. FBR has not violated any common law duty independent of the financing contract terms. In addition, MRO has not pointed to a representation or obligation other than the existence of the financing agreement upon which it can base a fraud or negligence claim. FBR's Motion to Dismiss is **Granted** as to Counts III and IV.

### C. Willful Conduct and Gross Negligence May be Averred Generally

Moreover, FBR argues that MRO has failed [*11] to sufficiently plead a cause of action because MRO's First Amended Complaint does not use the word "willful." This Court disagrees.

Delaware Superior Court Civil Rule 9(b) describes the causes of actions that are to be pled with particularity. It reads:

> [HN8] *(b) Fraud, negligence, mistake, condition of mind.* In all averments of

fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake should be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

[HN9] Willful and wanton each refer to a "distinct state of mind." n13 Accordingly, willful and wanton need only be averred generally as required in Rule 9(b).

> n13 *Johnson v. Pritchett, 2001 WL 1222100 *3 (Del. Super)(citing *Jardel Co., Inc. v. Hughes, 523 A.2d 518, 529-30 (Del. Supr. 1987)).*

In *Hedrick v. Webb*, n14 the Court held that [HN10] "the term aver [] implies that there must be at least a positive assertion of the state of mind. [*12]  " n15 There, the plaintiffs failure to mention wanton negligence or willful intent in their Complaint was fatal. n16 The Court held that the plaintiffs had no cause of action under the *Tort Claims Act* because they failed to mention the state of mind. n17

> n14 *2004 Del. Super. LEXIS 379, 2004 WL 2735517 (Del. Super.).*

> n15 *2004 Del. Super. LEXIS 379, [WL] at *7.*

> n16 *Id.*

> n17 *Id.*

While Plaintiffs do not use the word "willful" in their Complaint, this Court does not find the omission to be fatal. As discussed below, Plaintiffs have alleged sufficient facts to withstand a Motion to Dismiss.

### D. Wanton Conduct is a Question for the Jury

[HN11] Generally, the issue of whether facts and circumstances amount to willful conduct or gross negligence is a fact question for the jury. n18 It is a matter of law when the "conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence." n19 [HN13] Willful conduct has been defined as a "conscious indifference" or [*13]  "I don't care attitude which is the prerequisite of wanton behavior." n20 Wanton conduct is a "conscious indifference to consequences in circumstances where [the] probability of harm to another within

the circumference of the conduct is reasonably apparent, although harm to such others in not intended." n21

> n18 *Eustice v. Rupert, 460 A.2d 507, 509 (Del. Supr. 1983)*; *Nicholson v. Mount Airy Lodge, Inc., 1997 U.S. Dist. LEXIS 21035, 1997 WL 805185 *4 (E.D.Pa)*. (Internal citations omitted).

> n19 *Id.*(citing *Albright v. Abington Mem'l Hosp., 548 Pa. 268, 696 A.2d 1159,1165 (Pa. 1997))*.

> n20 *Eustice, 460 A.2d 509. (Internal citations omitted)*.

> n21 *Id.* (citing *Law v. Gallegher, 39 Del. 189, 9 W.W. Harr. 189, 197 A. 479, 482 (Del. Supr. 1938))*.

### 1. Breach of Contract

This Court finds that there is evidence from which a reasonable jury could find that FBR was grossly negligent or engaged in willful conduct in breaching the financing contract with MRO. First, the contract [*14] language stated that FBR conduct the Offering on a "best efforts basis only after execution of an underwriting agreement." As of May 1, 2002, FBR contended that the "deal was done." The deal, however, was not done and these representations were made merely three months before the expiration of the Lehman credit facility. In addition, the statements that led MRO to believe that the B piece was proceeding to the underwriting stage may not have been boasting. Finally, the issue of whether FBR was grossly negligent when they told Brownlie, who wanted to secure financing for the Lehman project, that he need not finance the project because it was done is best suited for a determination by the fact-finder.

### 2. Breach of Covenant of Good Faith and Fair Dealing

[HN14] The concept that a covenant of good faith and fair dealing is implied in a contractual relationship is well accepted in Delaware. n22 Good faith has been defined as "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." n23 Although MRO's allegations of the breach of covenant of good faith are vague at best, this Court does not believe that the count is so clearly without merit [*15] that it be dismissed. Accepting all well-pled allegations as true, FBR may have acted in disregard to MRO's expectations that financing be obtained when it told a possible financier that the "deal was done," when in fact, it was not.

> n22 *Merrill v. Crothall-American, Inc., 606 A.2d 96, 101 (Del. Supr. 1992)*. At common law, fair dealing and good faith was impliedly a part of every kind of contract. *See Restatement (Second) of Contracts § 204 (1979)*.

> n23 *Restatement (Second) of Contracts § 205, cmt. a. (1979)*.

This Court **DENIES** FBR's Motion to Dismiss Counts I and II because it cannot be concluded as a matter of law that FBR's conduct was not willful or grossly negligent.

### E. Velasco's Relationship with FBR

FBR and Velasco both asserted at the Motion that Velasco was in fact FBR's agent under the FBR/MRO contract. It is FBR's position that MRO must concede that Velasco is an agent of FBR [*16] because some of the causes of action against FBR stem from Velasco's actions. In contrast, MRO contends that previous to the hearing, FBR would not admit that Velasco was its agent. This Court believes that at this stage in the proceedings, there is a basis upon which the Plaintiffs may recover against Velasco. Velasco's Motion to Dismiss Counts III, IV, and V of the First Amended Complaint is **DENIED.**

[HN15] "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." n24 On the other hand, if the agent is an independent contractor, and the employer does not retain control over him, the employer is not liable for the independent contractor's negligent actions. n25

> n24 Restatement (First) of Agency § 1(1) (1933).

> n25 *Restatement (Second) of Torts § 414 (1977)*.

In the pleadings before the Court, there is insufficient evidence [*17] to determine if Velasco was an agent or an independent contractor for purposes of this Motion.

This Court is cognizant that FBR enlisted the help of Velasco, however, the status of their relationship remains an issue to be determined. This Court, with so little information, cannot conclude as a matter of law what Velasco's status was in the contract. The Motion, there-

fore, will not be dismissed with regard to the claims against Velasco.

### IV. Conclusion

Based on the foregoing reasons, Counts III and IV are DISMISSED against FBR. Counts I and II remain against FBR. Counts III, IV, and V remain against Velasco.

IT IS SO ORDERED.

J. Calvin L. Scott, Jr.

# EXHIBIT D

LEXSEE 2004 U.S. DIST. LEXIS 19875

**PATTI FRAZIER, RICKY L. MARTIN, and DAN BRIDGEMAN, individually and on behalf of others similarly situated, Plaintiffs, v. AMERICAN AIRLINES, INC. and TWA AIRLINES LLC, Defendants. BARBARA V. LEVY, individually and on behalf of others similarly situated, Plaintiff, v. AMERICAN AIRLINES, INC. and TWA AIRLINES LLC, Defendants.**

**Civil Action No. 03-734 JJF, Civil Action No. 03-792 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 19875; 33 Employee Benefits Cas. (BNA) 2590*

**September 30, 2004, Decided**

**PRIOR HISTORY:** *Frazier v. Am. Airlines, Inc., 2004 U.S. Dist. LEXIS 614 (D. Del., Jan. 16, 2004)*

**DISPOSITION:** [*1] Defendant's motion to dismiss was granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, retired employees of a now defunct airlines, sued defendant, the airline that purchased the assets of the defunct airline, asserting, as claims for relief: breach of contract, tortious conduct amounting to fraud, and, in the alternative, violations of the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001* et seq. The airline moved to dismiss all three claims under *Fed. R. Civ. P. 12(b)(6)*.

**OVERVIEW:** The former employees asserted that they had been deprived of travel passes they had received as a retirement benefit from the defunct airline to fly on that airline when space permitted. The purchasing airline maintained that the claims to the passes arose from or implicated the defunct airline's bankruptcy, but the employees claimed the right to the passes was based on an independent agreement with the purchasing airline. Although the court found the allegations of the complaint were insufficient on their face to constitute the elements of an enforceable contract, the court found it would be premature to dismiss the contract claim at the instant point, pending discovery on the issue. The other claims were dismissed, however, because the employees' fraud claim was based on the same allegations as the breach of contract claim that did not support fraud, and the allegations failed to establish the essential elements of an ERISA benefit plan. The travel passes could not be considered an ERISA benefit.

**OUTCOME:** The motion to dismiss was denied as to the breach of contract claim, but granted as to the tortious conduct and the ERISA claims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] A motion to dismiss tests the legal sufficiency of the complaint. In reviewing a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, courts must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. A court will grant a motion to dismiss only when it appears that a plaintiff could prove no set of facts consistent with the pleadings that would entitle him or her to relief.

*Contracts Law > Breach > Causes of Action*
[HN2] A claim for breach of contract requires a plaintiff to prove the existence of a contract, which includes an offer, acceptance, and consideration.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN3] When a case has been transferred pursuant to *28 U.S.C.S. § 1404*(a), a court must apply the choice of law rules of the state from which the case was transferred.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN4] The law of California and Arizona follows the principle that, if there is no conflict between the laws of

2004 U.S. Dist. LEXIS 19875, *; 33 Employee Benefits Cas. (BNA) 2590

the competing jurisdictions, a court need not determine which state's substantive law applies.

*Contracts Law > Formation > Formation Generally*
[HN5] The law of Arizona, California, and Delaware requires the same elements for the formation of a contract.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*
[HN6] A plaintiff need not plead every element of his or her prima facie case. A court should not transpose an evidentiary standard into a pleading standard. Plaintiffs generally need not explicitly allege the existence of every element in a cause of action, if fair notice of the transaction is given and the complaint sets forth the material points necessary to sustain recovery.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN7] The elements of fraud are (1) false representation of a material fact; (2) knowledge that the representation was false or made with reckless indifference to the truth; (3) intent to induce another to act; (4) a party's action based on reasonable reliance on the representation; and (5) damages.

**COUNSEL:** Stephen H. Gardner, Esquire of LAW OFFICE OF STEPHEN GARDNER, Dallas, Texas.

Attorney for Plaintiffs Patti Frazier, Ricky L. Martin, Dan Bridgeman, and Barbara V. Levy.

Frederick L. Cottrell, III, Esquire, Mark D. Collins, Esquire, Michael J. Merchant, Esquire, Steven J. Fineman, Esquire, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware.

Of Counsel: Richard A. Rothman, Esquire, and Robert S. Berezin, Esquire, of WEIL, GOTSHAL & MANGES LLP, New York, New York. Attorneys for Defendants American Airlines, Inc. and TWA Airlines LLC.

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:** Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court are the Motions To Dismiss filed by American Airlines, Inc., and TWA Airlines, LLC, (collectively "American"). (D.I. 64 in C.A. No. 03-734; D.I. 45 in C.A. No. 03-792.) For the reasons

set forth below, the Court will grant, in part, the Motions. n1

> n1 In Barbara v. Levy v. American Airlines, Inc., C.A. No. 03-792 JJF, American filed a Joinder In Motion To Dismiss (D.I. 45) whereby it incorporated by reference the Motion to Dismiss in the related action Frazier v. American Airlines, Inc., C.A. No. 03-734 JJF. Accordingly, all citations to docket items in this matter will be to C.A. No. 03-734.

[*2]

**BACKGROUND**

In a January 16, 2004, Memorandum Opinion and Order (the "January 16 Opinion") (D.I. 61, 62), the Court denied American's motions to dismiss, which American based on collateral estoppel, law of the case doctrine, and principles of comity. In the January 16 Opinion, the Court granted American leave to renew its motions to dismiss because Plaintiffs' attorney indicated at oral argument that he did not understand American's motions to seek dismissal for failure to state a claim. American's renewed Motions are now before the Court.

The Court previously discussed the factual background of the instant cases in the January 16 Opinion and, therefore, will only provide here a brief history. Plaintiffs are past employees of the now bankrupt Trans World Airlines ("TWA"). In TWA's Chapter 11 bankruptcy, In re Trans World Airlines, Inc., Bankr. A. No. 01-0056 (PJW) (the "TWA Bankruptcy"), American purchased substantially all of TWA's assets. In relevant part, the terms of the purchase were set forth in a Sale Order and Asset Purchase Agreement ("APA") entered by the Bankruptcy Court. The parties agree that, according to the terms of the APA and Sale Order, any obligations [*3] alleged to be owed by American to Plaintiffs, must have been assumed by American independent of the TWA Bankruptcy; otherwise, they constitute impermissible collateral attacks on the APA and/or Sale Order. (D.I. 69 at 4; D.I. 72 at 1.)

Plaintiffs assert three claims for relief in their Complaints: breach of contract, tortious conduct, and in the alternative, violations of the *Employee Retirement Income Security Act ("ERISA")*. Plaintiffs contend that, under its three claims, American is liable for refusing to honor part a retirement benefit Plaintiffs had received from TWA--specifically, travel passes that enabled them to fly on TWA airplanes and receive reduced fares on other airlines (the "travel benefits"). By its motions, American moves to dismiss all three counts of Plaintiffs' Complaints.

## STANDARD OF REVIEW

[HN1] A motion to dismiss tests the legal suffi-ciency of the complaint. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. In reviewing a motion to dismiss pursuant to *Rule 12(b)(6)*, courts "must accept as true the factual allegations in the com-plaint and all reasonable inferences that can be drawn therefrom." *Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000)*. [*4] A court will grant a mo-tion to dismiss only when it appears that a plaintiff could prove no set of facts consistent with the pleadings that would entitle him or her to relief. Id.

## DISCUSSION

## I. Whether The Complaint Is An Impermissible Col-lateral Attack On The Sale Order

### A. Contentions

American contends that Plaintiffs' allegations are an impermissible collateral attack on the Sale Order. American maintains that Plaintiffs' contention that its claims are based on an agreement independent of the TWA bankruptcy is "groundless" because most of the allegations in the Complaints arose from or implicate the TWA bankruptcy.

In response, Plaintiffs maintain that they are not at-tempting to retry matters in the TWA bankruptcy be-cause they agree that any such attempt would be imper-missible. Instead, Plaintiffs contend that their claims are based on independent promises made by American.

### B. Decision

The Court has considered the allegations of the Complaints and concludes that, at least for the purposes of the instant motions, Plaintiffs' alleged claims do not assert an impermissible collateral attack on the Sale Or-der. (D.I. 66, Ex. A at P 4; Ex. B at P 4.) n2 The [*5] Sale Order entered by the Bankruptcy Court bars "all Persons ... from taking any action against [American] to recover any claim which such person had solely against [TWA]." Id. at Ex. J, P 11. In the Complaints, Plaintiffs formulated their allegations to assert that American made offers to them "wholly independent" and "separate from" the TWA bankruptcy. Id. Thus, although American con-tends that Plaintiffs' claims are, in effect, asserting obli-gations from TWA bargaining agreements that American did not assume and are barred by the Sale Order, the Court concludes that the instant motions mu st be denied to the extent they seek dismissal of claims that Plaintiffs assert arise independent of the bankruptcy.

n2 In the Complaints, Plaintiffs explicitly rely on a number of documents in support of their

claims. Accordingly, the Court will reference these documents in resolving the instant motions. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)*.

## II. Whether [*6] Plaintiffs Have Stated A Claim For Breach Of Contract

### A. Contentions

American contends that Plaintiffs have failed to state a claim for breach of contract because the statements alleged to constitute an offer by American constitute, at most, unilateral statements of future intention which cannot qualify as an enforceable offer. American further asserts that many of the statements relied upon by Plain-tiffs may not be used to allege a claim for breach of con-tract because they arise from or are related to the TWA bankruptcy. Moreover, American contends that these statements cannot be an offer because they are insuffi-ciently specific. Next, American contends that Plaintiffs have failed to plead that they provided any consideration to, or accepted an offer from, American.

Plaintiffs respond that the statements made by American and cited in the Complaints satis fy the notice pleading standard of the Federal Rules of Civil Proce-dure for alleging breach of contract. Plaintiffs also main-tain that discovery may lead to the uncovering of addi-tional evidence of the offer by American to Plaintiffs.

### B. Decision

The Court concludes that it would be premature to dismiss Plaintiffs' [*7] Complaints for failure to state a claim of breach of contract. [HN2] A claim for breach of contract requires a plaintiff to prove the existence of a contract, which includes an offer, acceptance, and con-sideration. *Careau & Co. v. Sec. Pac. Bus. Credit, Inc., 272 Cal. Rptr. 387, 395, 222 Cal. App. 3d 1371 (Cal. Ct. App. 1990)*; *Hunter v. Diocese of Wilmington, 1987 Del. Ch. LEXIS 468, 1987 WL 15555 (Del. Ch. Aug. 4, 1987)*; *Savoca Masonry Co. v. Homes & Son Constr. Co., 112 Ariz. 392, 542 P.2d 817, 819 (Ariz. 1975)*. n3

N3 [HN3] When a case has been transferred pursuant to *28 U.S.C. § 1404(a)*, as in this case, the court must apply the choice-of-law rules of the state from which the case was transferred. *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 244 n.8, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981)* (citing *Van Dusen v. Barrack, 376 U.S. 612, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1946)*). In this case, the two actions before the Court were

2004 U.S. Dist. LEXIS 19875, *; 33 Employee Benefits Cas. (BNA) 2590

transferred from Arizona and California. Thus, the Court must look to those states' rules for the choice-of-law analysis.

As American correctly argues, both [HN4] California and Arizona follow the principle that if there is no conflict between the laws of the competing jurisdictions, the Court need not determine which state's substantive law applies. See *Bruce Church, Inc. v. United Farm Workers, 169 Ariz. 22, 816 P.2d 919, 930 n. 8 (Ariz. Ct. App. 1991); Waggoner v. Snow, Becker, Kroll, Klaris & Krauss, 991 F.2d 1501, 1506 (9th Cir. 1993)*. In this case, it is not disputed by the parties that[HN5] Arizona, California, and Delaware require the same elements for the formation of a contract, (See D.I. 79 at 37; D.I. 76 at 2) and, therefore, the Court need not decide which state's law applies. Compare *Savoca Masonry Co., Inc. v. Homes & Son Constr. Co., Inc., 542 P.2d 817, 819 (Ariz. 1975)*, with *Careau & Co. v. Sec. Pac. Bus. Credit, Inc., 272 Cal. Rptr. 387, 395 (Cal. Ct. App. 1990)*.

[*8]

With respect to whether Plaintiffs sufficiently alleged an offer, the Court concludes that Plaintiffs have satisfied the requirements of notice pleading. A promise, which is a "'manifestation of intention to act,'" is an offer when it is extended in exchange for consideration. *Hunter, 1987 Del. Ch. LEXIS 468, 1987 WL 15555, at *5* (quoting *Restatement (Second) of Contracts § 2*). In the Complaints, Plaintiffs assert an offer by alleging that American agreed to be responsible for their travel benefits because it knew the benefits were necessary to obtain the cooperation of TWA unions in the purchase of TWA. (D.I. 66, Ex. A at PP 4, 24, 46, 47, 23; Ex. B PP 4, 21, 17.) In C.A. No. 03-792 JJF, the Plaintiffs also alleged that, after the Bankruptcy Court's entry of the Sale Order, American confirmed its intent to honor Plaintiffs' travel benefits. Id. Ex. B at P 5.

The Court further concludes that Plaintiffs have sufficiently alleged that they provided consideration in exchange for American's offer to honor their travel benefits (D.I. 66, Ex. A at PP 23-24, 29; Ex. B at PP 16-17, 22) and acceptance, id. Ex. A at 29, Ex. B at 22, that precludes, at [*9] this juncture, the Court from dismissing the breach of contract claims. n4 Thus, although the Court agrees with American that some of the statements alleged in the Complaints and identified by Plaintiffs as establishing an offer, consideration, and acceptance, are, on their face, insufficient to constitute the elements of an enforceable contract, the Court will permit Plaintiffs to engage in discovery on these matters, after which time the Court will be able to more appropriately determine whether Plaintiffs' claims lack merit. *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002)*.

n4 In addition, even were the Court to conclude that Plaintiffs had not pled every element of breach of contract, the Court would be hesitant to grant dismissal because generally, to survive a Rule 12(b)(6) motion, [HN6] a plaintiff need not plead every element of his or her prima facie case. *Swierkiewicz v. Sorema, 534 U.S. 506, 512, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002)* (stating that a court should not transpose an evidentiary standard into a pleading standard); *Menkowitz, M.D. v. Pottstown Mem'l Med. Ctr., 154 F.3d 113, 124 (3d Cir. 1998)* ("plaintiff[s] generally need not explicitly allege the existence of every element in a cause of action if fair notice of the transaction is given and the complaint sets forth the material points necessary to sustain recovery.") (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1216, at 154-162 (2d ed. 1990)).

[*10]

## III. Whether Plaintiffs Adequately Alleged A Tortious Conduct Claim

### A. Contentions

American contends that Plaintiffs have not stated a claim for fraud because they have not pled reasonable reliance. Specifically, American maintains that as Plaintiffs failed to plead a sufficiently definite offer in order to state a claim for breach of contract, Plaintiffs have, for the same reasons, failed to allege reasonable reliance. American also contends that Plaintiffs are attempting to "bootstrap" a breach of contract claim into a fraud claim and that Plaintiffs have not pled that statements allegedly made by American were made with knowledge of their falsity. In their reply brief, American further asserts that Plaintiffs' Complaints do not satisfy *Rule 9(b)*'s particularity requirements for pleading fraud.

Plaintiffs respond that, just as it pled an offer by American that satisfied its obligations of notice pleading, they have pled reasonable reliance. Also, Plaintiffs contend that they are not attempting to "bootstrap" a breach of contract claim into a fraud claim because they allege in the Complaints that American had no intention of honoring its promises.

### B. Decision [*11]

2004 U.S. Dist. LEXIS 19875, *; 33 Employee Benefits Cas. (BNA) 2590

In their opposition brief, Plaintiffs clarify that their tortious conduct claim is a claim for fraud. (D.I. 48 at 17.) [HN7] The elements of fraud are 1) false representation of a material fact; 2) knowledge that the representation was false or made with reckless indifference to the truth; 3) intent to induce another to act; 4) a party's action based on reasonable reliance on the representation; and 5) damages. *Lazar v. Superior Court, 12 Cal. 4th 631, 49 Cal. Rptr. 2d 377, 380, 909 P.2d 981 (Cal. 1996)*; *Browne v. Robb, 583 A.2d 949, 955 (Del. 1990)* (citations omitted); *Echols v. Beauty Built Homes, Inc., 132 Ariz. 498, 647 P.2d 629, 631 (Ariz. 1982)*.

With respect to American's contention that Plaintiffs have not alleged reasonable reliance, because American relies upon its earlier arguments that Plaintiffs' allegations are not sufficiently definite that the Court rejected above, the Court will not dismiss Plaintiffs' tortious conduct claim for failure to plead reasonable reliance. n5 However, with regard to American's argument that Plaintiffs are attempting to "bootstrap" a contract claim into an action for fraud, the Court agrees with American that [*12] Plaintiffs are attempting to assert a fraud claim based on allegations that only support a breach of contract claim.

> n5 To the extent American contends in its Reply Brief that the Complaints should be dismissed for failure to satisfy *Rule 9(b)'s* particularity requirements, the Court notes that American did not move to dismiss the Complaints based on *Rule 9(b)*. American moved to dismiss pursuant to *Rule 12(b)(6)*. (D.I. 64.)

Plaintiffs maintain that their allegation that American never intended to keep its promise to honor the travel benefits demonstrates that they are not attempting to "bootstrap" a contract claim into a fraud claim. (D.I. 69 at 19.) Plaintiffs argue that the Court's decision in *Red Mt. Holdings, Ltd. v. Stout P'ship, 2001 U.S. Dist. LEXIS 25562, 2001 WL 34368400 (D. Del. March 30, 2001)*, supports the sufficiency of their allegations. (D.I. 69 at 19.) Close scrutiny of Red Mountain reveals, however, that the Court has previously rejected this argument.

In Red Mountain, the Court relied [*13] on the Delaware Chancery Court's decision in *IOTEX Communs., Inc. v. Defries,1998 Del. Ch. LEXIS 236, Civ. A. No. 15817, 1998 WL 914265 (Del. Ch. Dec. 21, 1998)*. In IOTEX the Court of Chancery, when dismissing the plaintiff's complaint, remarked that a breach of contract claim "cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform.'" *Red Mt., 2001 U.S. Dist. LEXIS 25562, 2001 WL 34368400, at *4* (quoting *IOTEX, 1998 Del. Ch. LEXIS 236, 1998 WL 914265 at *5*) (emphasis added). As indicated in their opposition brief (D.I. 69 at 19), Plaintiffs are attempting to do precisely what the court forbid in *IOTEX* and, accordingly, the Court will dismiss the tortious conduct claims.

## IV. Whether Plaintiffs State A Claim For Violations Of ERISA

### A. Contentions

American contends that travel privileges, such as those Plaintiffs are attempting to enforce in this case, are not covered by ERISA. American also asserts that, even were the Court to conclude that the travel benefits Plaintiffs seek are covered by ERISA, the allegations pled by Plaintiffs do not establish the essential elements [*14] of an ERISA benefit plan. Next, under ERISA, American maintains that it is permitted to eliminate the passes at any time. Finally, American contends that Plaintiffs are precluded from asserting their ERISA claim because they allege that it is part of a package of benefits they received from TWA which, as ordered in the APA, was not assumed by American.

In response, Plaintiffs contend that they are only asserting, in the alternative, that if the Court finds that ERISA applies, that ERISA provides Plaintiffs with their travel benefits. Plaintiffs also contend that the cases cited by American do not preclude ERISA from covering the travel benefits at issue because the travel benefits were part of an overall retirement package provided to Plaintiffs.

### B. Decision

Based upon the parties' description of the travel benefits at oral argument, the Court understands that the travel benefits were only usable when seats were vacant--i.e. for standby seating. As such, the travel benefits do not qualify as pension benefits, and therefore, are not covered under ERISA. See *Musmeci v. Schwegmann Giant Supermarkets, Inc., 332 F.3d 339, 347 (5th Cir. 2003)* (noting that travel benefits [*15] permitting retirees to fly free only when there were empty seats were not covered by ERISA because such benefits provided only a no-additional-cost-service) (citations omitted). Accordingly, the Court will dismiss Plaintiffs' ERISA claim.

## CONCLUSION

For the reasons discussed, the Court will grant, in part, American's Motions to Dismiss.

An appropriate Order will be entered.

## ORDER

2004 U.S. Dist. LEXIS 19875, *; 33 Employee Benefits Cas. (BNA) 2590

At Wilmington, this 30th day of September, 2004, for the reasons discussed in the Opinion issued this date;

IT IS HEREBY ORDERED that the Motions to Dismiss filed by American Airlines, Inc., and TWA Airlines, LLC, (collectively "American") (D.I. 64 in C.A. No. 03-734 JJF; D.I. 45 in C.A. No. 03-792 JJF), with respect to:

1) Plaintiffs' breach of contract claim is **DENIED;**

2) Plaintiffs' tortious conduct claim is **GRANTED;**

3) Plaintiffs' claim for violation of the Employee Retirement Income Security Act is **GRANTED.**

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| BLUE HEN HOTEL, LLC, | ) | |
| | ) | CIVIL ACTION NO.  05-CV-00221 (JJF) |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| CHARLES P. ARENA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**CERTIFICATE OF SERVICE**

I, Frank E. Noyes, II, Esquire, hereby certify that on this 19th day of September,

2005, I caused a true and correct copy of the foregoing BRIEF OF PLAINTIFF BLUE

HEN HOTEL, LLC IN OPPOSITION TO CHARLES ARENA'S MOTION TO

DISMISS to be served upon counsel by e-filing and in the manner indicated:

        Adam Balick, Esquire
        Bifferato, Gentilotti, Biden & Balick
        711 N. King Street
        Wilmington, DE 19801

                            _____
                            Frank E. Noyes, II Esquire (#3988)

- 1 –

DOCS_DE 115922v1