# EXHIBIT A



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: 2002 WL 1335360 (Del.Super.))

Page 1

H
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
CHRISTIANA MARINE SERVICE CORPORATION, Plaintiff,
v.
TEXACO FUEL AND MARINE MARKETING INC. and Texaco Inc., Defendants.
No. Civ.A. 98C-02-217WCC.

Submitted Jan. 2, 2002.
Decided June 13, 2002.

On Defendant Texaco Fuel and Marine Marketing Inc., and Texaco Inc.'s Motion for Summary Judgment. Granted in part; denied in part.

John D. Balaguer, White & Williams LLP, Wilmington, Delaware, for Plaintiff, Christiana Marine.

James J. Maron & John P. Daniello, Maron & Marvel, P.A., Wilmington, Delaware, for Defendants, Texaco Inc.

Peter R. Kahana & Daniel M. Cohen, Berger & Montague, P.C., Philadelphia, PA, for Defendant, Texaco Fuel and Marine Marketing, Inc. and Texaco, Inc.

MEMORANDUM OPINION

CARPENTER, J.

*1 Defendants have filed a motion for summary judgment pursuant to Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief could be granted. The core of this controversy centers upon an alleged oral long term requirement contract between Texaco Fuel and Marine Marketing, Inc. (hereinafter "Texaco"), and Christiana Marine Service Corporation (hereinafter "Christiana") a bunker fuel provider. [FN1] Christiana seeks compensatory damages without limitation to its lost profits; and consequential damages, consisting of Christiana's economic losses. The Court has heard oral argument on the motion and for the reasons set forth below, Texaco's motion for summary judgment is denied in part, and granted in part.

> FN1. Christiana has sued Texaco's parent company, Texaco Incorporated, in addition to Texaco, pursuant to vicarious liability.

FACTS

Christiana Marine was incorporated in 1986, after its successor corporation, Compass Marine Corporation, ceased doing business. Christiana was a barge contractor that transported marine bunker fuel, a low grade black oil, in the Delaware River. Usually, when ships are at sea and need fuel, they will notify the oil providers in a particular port, such as Texaco or its competitors. The oil provider, is informed of the ship's arrival date, and the amount of bunker fuel needed to which the oil companies reply with their bids. Once awarded a contract, the oil company hires a barge contractor to transport the oil to the ships who requested the fuel. [FN2]

> FN2. Christiana had two business locations: one in Chester, Pennsylvania, where delivery vessels were berthed during non-use and repair, and one in Wilmington, Delaware, where orders were received, invoices were sent, and where payments were received from Texaco.

In 1988 Texaco purchased a new supply facility, the Delaware Terminal Corporation ("DTC") in Wilmington, Delaware to increase Texaco's market share in the Delaware River area. Because DTC was in Wilmington, and not in, or as near to Philadelphia, it was slightly alienated from (1) the highest business activity where most other supply facilities were located; and (2) where most of the ships that had to be serviced were located. [FN3] Bunker fuel deliveries from a more distant area, such as Wilmington, were assessed higher rates to transport bunker fuel, as compared to the established rates in the Delaware River zone. In addition, DTC was not equipped to handle bunkers, and had experienced substantial congestion problems because of this. [FN4] To solve these problems, Texaco needed a barge carrier who would agree to provide below market prices for fuel deliveries from DTC, and who would also agree to exclude demurrage for loading delays at Texaco's congested terminal. [FN5] It was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: 2002 WL 1335360 (Del.Super.))

Page 2

in this environment that the business relationship between Texaco and Christiana began.

> FN3. Most supply facilities are located in Philadelphia, Pennsylvania.
>
> FN4. Bruce Bond Dep. at 51. Barge contractors like Christiana, pick up the bunker fuel at the oil company's terminal and deliver the fuel to the ship at sea. Thus in this situation, Texaco would pay Christiana, Christiana's barges would go to DTC to pick up the bunker fuel, and then with the aid of its own tugboats, take the barges full of bunker fuel out to the ships who paid Texaco for the fuel.
>
> FN5. Plaintiff's Response Brief at 2.

Before the alleged contract with Texaco, Christiana had a virtual monopoly on small to medium size bunker jobs in the Delaware River area, [FN6] and had sufficient equipment to conduct its usual business successfully. According to Christiana, Texaco proposed a long term agreement, which provided that Texaco would employ Christiana as its exclusive bunker barge contractor for all of its marine bunker fuel requirements, in exchange for Christiana's commitment to have ample equipment on hand to deliver Texaco's requirements upon demand. [FN7] In addition to these terms, Christiana and Texaco allegedly agreed that Texaco would receive discounted delivery charges, at below market rates, along with no additional penalties for loading delays at DTC. [FN8] In 1990, the parties apparently orally modified their business relationship and agreed that Christiana would "load and hold," would pay ship demurrage, and would pay extra unusual costs, which Texaco may have encountered, in return for Texaco's commitment to put through an average 200,000 bbls. of oil per month. [FN9] Christiana considered the 200,000 quote a minimum average, with Texaco anticipating a 225,000 or 250,000 bbls a month throughput. In other words, Christiana presumed the 200,000 barrels was a floor, not a ceiling. Regardless, Texaco did not meet this alleged "guaranteed" minimum monthly average, as it only put through 200,000 barrels as promised in eight months out of the forty-eight months Christiana and Texaco had a business relationship. Neither the initial agreement nor the subsequent modifications were in writing and the relationship was strictly based on the parties' oral understandings.

> FN6. York's Report at 6 (citing the October 28, 1999 Bruce R. Bond deposition p. 238).
>
> FN7. Texaco even published a pamphlet, which stated "[Christiana], our bunker barge contractor, and local operating agent is based in Wilmington, DE in close proximity to our loading facility. [Christiana] operates several barge units ranging in capacity from 1700-3000 metric tons. DTC and [Christiana] offer Texaco flexibility second to none any supplier on the river."
>
> FN8. Because barge carriage is generally a small margin, fixed cost business, Christiana would have a unique opportunity to secure a steady, expanding stream of business, provided by Texaco, if it entered into this "agreement."
>
> FN9. Bates Dep. at 86.

*2 Based upon Texaco's alleged representations that it planned to put through 200,000 bbls. of oil per month, Christiana went to the First National Bank of Maryland ("FNBM") and secured loans to purchase additional barges, tugboats, and equipment, that would be required for the work Texaco and Christiana anticipated. George Wood, the loan officer at FNBM was responsible for handling and securing approval for the loans and testified that he sensed there were "understandings" between the two parties as to future business. However, he did not know what the terms of that agreement were, nor did he investigate or require the production of agreements to approve the loans. Loan documents evidence that FNBM received a "favorable reference from Mr. Bruce Bond of Texaco," that Texaco referred to Mr. Bates as a "no-nonsense businessman who always gets the job done," that on a "monthly basis, Christiana moves roughly 150,000 barrels of bunkers, and [Texaco] wants to increase this to 200,000," and that "Texaco is looking for a long term relationship with Christiana." [FN10]

> FN10. June 20, 1989 loan document.

The alleged oral contract between Christiana and Texaco ensued until Christiana wrote Texaco a letter in August of 1995, informing them that Christiana could not continue to provide bunker transportation because of the lack of Texaco's business and the cost of providing the service. [FN11]

> FN11. "It is with regret that [Christiana] had to inform Texaco last week that we could no

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: 2002 WL 1335360 (Del.Super.))

Page 3

longer provide bunker transportation in Philadelphia. The volume had gotten so small and the costs so high...." August 16, 1995 letter from William Bates to C. Michael Bandy of Texaco.

## PROCEDURAL POSTURE

On February 20, 1998, Christiana filed a complaint against Texaco and alleged six separate counts: (1) breach of contract--volume of business; (2) breach of contract--duration; (3) breach of contract--notice of termination; (4) breach of contract--duty of good faith and fair dealing; (5) promissory estoppel pursuant to Super. Ct. Civ. R. 8(e)(2); and (6) negligent misrepresentation. Texaco has filed a summary judgment motion requesting the dismissal of all claims.

## STANDARD OF REVIEW

A motion for summary judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [FN12] If a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts, to clarify the application of the law, summary judgment is inappropriate. [FN13] Moreover, if it appears to the Court that there is any reasonable hypothesis, by which the nonmoving party might recover, the motion will be denied. [FN14] The Court is required to examine all pleadings, affidavits and discovery material provided to the Court, [FN15] accept all non-disputed facts as true, and must accept the non-movant's version of any disputed facts. [FN16]

> FN12. *See Schueler v. Martin,* 674 A.2d 883, 885 (Del.Super.1996); *Pierce v. International Ins. Co. of Ill.,* 671 A.2d 1361, 1363 (Del.1996); *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).
>
> FN13. *Kysor Industrial Corp. v. Margaux,* 674 A.2d 889, 894 (Del.Super.1996).
>
> FN14. *Vanaman v. Milford Memorial Hospital, Inc.,* 272 A.2d 718, 720 (Del.1970).
>
> FN15. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* 312 A.2d 322 (Del.Super.1973).
>
> FN16. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96 (Del.1992).

## DISCUSSION
### A. Doctrine of Laches / Statute of Limitations

Texaco asserts that Christiana's breach of contract, promissory estoppel, and negligent misrepresentation claims are all barred pursuant to the doctrine of laches because Christiana's time to bring suit started in July 1993, when it became clear the terms of the contract as alleged by Christiana were not being met. [FN17] Additionally, Texaco claims that Christiana consulted counsel in 1995, when it went out of business, to consider bringing a claim against Texaco; that Christiana intentionally misled Texaco "by writing Texaco a soothing, non-accusatory" 1995 letter saying nothing about a claim; that Christiana and its former attorney deliberately chose not tell Texaco about the alleged claim to inhibit Texaco from taking steps to defend itself. Texaco alleges that it was prejudiced (thus satisfying the element of laches that demands significant prejudice be shown) by Christiana's delay because: (1) out of the 48 months Christiana transported Texaco's bunker oil, Texaco only reached the alleged 200,000 barrels a month for 8 months, so if Christiana considered this "lower throughput" a breach of contract, they had an obligation to notify Texaco so it could have limited its damages by terminating the alleged contract at that point in time, and (2) Texaco is now unable to affectively defend itself as many documents and files regarding this relationship have been destroyed. Texaco stated that its computer files only date back until 1994, which makes locating precise and complete data for the relevant time period impossible.

> FN17. Texaco's Brief at 20.

*3 Christiana contends that the alleged contract was a continuous one, and as such, the statute of limitations was not triggered until the entire contract had been terminated. Christiana claims the breach of contract occurred in August, 1995, which was the date of Mr. Bates' letter to Texaco notifying it that Christiana would be unable to participate in further business. Christiana also asserts that a laches agreement is unavailable to Texaco because Texaco "effectively" caused the termination of the agreement in its continuously low throughput, which caused Christiana to be prejudiced and to go out of business. And lastly, Christiana claims that Texaco is responsible for the lost computer files and documents, as Texaco took their mainframe computer out of service at the end of 1993. Christiana also points out that Texaco has been on notice of this lawsuit since May 1, 1996, and thus, could've kept

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: 2002 WL 1335360 (Del.Super.))

Page 4

records and documents for its defense as of that date. [FN18]

> FN18. Plaintiff's Brief in Opposition to Defendant's Motion at 20.

"The test of laches is both unreasonable delay and consequent significant prejudice." [FN19] In an attempt to determine what constitutes unreasonable delay, the Court should first consider the time limitation fixed by the statute of limitations. [FN20] Delaware's statute of limitations for contract and negligence actions is found in 10 Del. C. § 8106. The 3 year limitation on cause of actions for an alleged **breach** of **contract** accrues at the time of the **breach**, [FN21] whereas a tort claim accrues at the time of the injury. [FN22]

> FN19. *Wilkes v. H.M. Wrangell & Co.*, 293 F.Supp. 522, 524 (D.Del.1968)(citing *Gutierrez v. Waterman S.A. Corp.*, 373 U.S. 206, 215, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Claussen v. Mene Grande Oil Co.*, 275 F.2d 108, 113 (3d Cir.1960)).
>
> FN20. *Wilkes*, 293 F.Supp. at 524.
>
> FN21. *Fineberg v. Credit Int'l Bancshares, Ltd.*, 857 F.Supp. 338 (D.Del.1994); *Nardo v. Guido DeAscanis & Sons*, 254 A.2d 254 (Del.Super.1969).
>
> FN22. *Howmet Corp. v. City of Wilmington*, 285 A.2d 423 (Del.Super.1971).

The Court finds that the statute of limitations, 10 Del. C. § 8106, did not begin to run until there was an affirmative termination by one of the parties. Christiana wrote the August 1995 letter to Texaco, which terminated the arrangement between these two parties. Until then, the two parties continuously conducted business with one another and Christiana operated as Texaco's bunker fuel contractor. As such, under the statute of limitations applicable to contracts, Christiana had until August, 1998 to file its claims against Texaco. [FN23] Since Christiana filed the instant action on February 20, 1998, it appears that Christiana successfully brought its claims within its window of opportunity. The Court finds that Christiana's claims have not been unreasonably delayed.

> FN23. An issue not addressed by the parties is whether the statute of limitations would prevent the tort action from proceeding forward since the "time of the injury" may have occurred before the termination of the contract. Since that count is being dismissed on other grounds the issue will not be addressed.

Additionally, the Court is not convinced that Texaco has been unduly prejudiced by the delay in bringing this lawsuit. The basic foundation underlying this litigation is the lack of documentation evidencing this business relationship. Thus to argue the passing of time has limited Texaco's access to documentation is absurd. Whatever documents, if any, were ever created would appear to have minimal relevance to the issues being litigated and the individuals involved are still available to testify about the events.

Further, while it is undisputed that Texaco, during its business relationship with Christiana, failed most months to meet the alleged 200,000 bbls. throughput, this does not equate to an obligation by Christiana to terminate the relationship so Texaco could minimize its damages. While this fact may be relevant to the jury's determination of whether a contract existed and if so, the terms of that contract, it does not rise to the level of prejudice required to prevent a subsequent lawsuit. Texaco is an international corporation with significant resources but in this business relationship, it appears to have acted like a mom and pop grocery store relying upon a handshake and ones goodwill to perform an important business function. To argue that Christiana has tricked or mislead Texaco is simply an assertive legal effort to mine all possible avenues to prevent recovery. The argument is simply without merit. The Court finds neither unreasonably delay or prejudice and thus the claims are not barred by the doctrine of laches.

*B. Breach of Contract Claims*

\*4 While it is the Court's province to define a contract, it is the jury's function to decide whether a contract exists. [FN24] In *Universal Products Co. v. Emerson*, [FN25] the Supreme Court of Delaware followed numerous other court's holdings that it is the Court's duty to determine whether a contract has been created, when the documentary evidence's authenticity is not challenged. [FN26] The *Emerson* court noted however, that the above rule does not apply "where the question, as to whether an alleged contract was made, turns on the proper conclusion to be drawn from a series of [documents] considered in connection with other pertinent facts and circumstances proved." [FN27] Stated differently, when other facts and circumstances germane to the

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: 2002 WL 1335360 (Del.Super.))

Page 5

issue are to be considered in addition to any documentary evidence, a jury is to decide whether or not a contract was formed, not the Court.

> FN24. *Corletto v. Morgan,* 89 A. 738 (Del.Super.1914).
>
> FN25. *Universal Products Co. v. Emerson,* 179 A. 387 (Del.1935).
>
> FN26. *Id.* at 393.
>
> FN27. *Id.* at 394.

Texaco contends that there is simply no evidence, aside from the deposition testimony of Mr. Bates, to indicate that a contract, or long term agreement or "relationship" was ever contemplated by either of the parties. Indeed, Texaco's expert, Patrick J. Studdert, stated in his report that

> [i]n all my years in the bunker transportation business, I have never had an oral agreement of the kind Mr. Bates said he had between Christiana and Texaco and I have never heard of one in any port. It is not the custom or practice in the bunker fuel transportation industry. [FN28]

> FN28. Studdert's Report at 3.

Texaco asserts that "it is undisputed in the bunker fuel barge delivery industry--that deliveries are made by barge carriers for oil companies on an "as available basis." [FN29] Texaco further mentions that both parties' experts agree that barge carriers do not customarily have contracts like the one alleged by Christiana--long term oral contracts with minimum guaranteed monthly delivery quotas. Texaco then asserts that because Christiana did not exclusively work for Texaco, and it continued to conduct business with other oil companies, it cannot now claim that it purchased the additional barges, tugboats, and equipment from FNBM for the sole purpose of Texaco's alleged "long term agreement" to put through the amount of oil it allegedly promised.

> FN29. Texaco's motion at 3.

Christiana contends that the record thus far is replete with evidence indicative of a contract, or that a contractual relationship was contemplated by these parties. Christiana points to (1) Mr. Bates' deposition testimony; (2) George Wood's deposition testimony (the First National Bank of Maryland ("FNBM")'s representative); and the mere evidence of Mr. Bates' extensive loans, taken to purchase more equipment, barges, and tugboats in 1991 and 1992. Christiana's expert, Robert B. York contends that Christiana and Texaco's relationship was contractual, and more specifically stated in his report that

> "[a] contract existed between [Christiana] and [Texaco] which went far beyond the normal terms of and is in consistent with an "as available" bunker agreement per posted rates and which, based on testimony, is consistent with a Requirements Contract. [FN30]

> FN30. York's Report at 20.

*5 The Court first finds that whether an oral contract, or a contract created by conduct was established between Christiana and Texaco, is not an issue that can be decided upon a motion for summary judgment. A reasonable jury may conclude that regardless of the fact a written contract was not prepared and signed, Texaco and Christiana had mutual, beneficial interests at stake in this business venture, and as such, an enforceable contract was created. The Restatement Second of Torts § 19 provides that "[t]he manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." [FN31] Subsection (3) further states that "[t]he conduct of a party may manifest assent even though he does not in fact assent." [FN32] The jury may find that Texaco's conduct manifested an assent to be bound, based upon Mr. Bates' testimony, Mr. York's expert opinion and testimony, combined with other documents and evidence as to the events during the 48 month relationship. Texaco's arguments are simply ones that can be presented to the jury and used in their deliberations as to whether a contract existed. The type of business relationship between Texaco and Christiana is the core of this litigation, and to assert that the facts are settled and undisputed is simply unsupportable by the record when viewed in light most favorable to the non-moving party. Facts are not undisputed simply because one party believes their version is the only logical conclusion to draw from the events. Fortunately, jurors, not counsel, make such decisions.

> FN31. Restatement (Second) Torts § 19.
>
> FN32. *Id.*

*C. Negligent Misrepresentation Claim*

Finally, Texaco asserts that Christiana's negligent **misrepresentation** claim is barred by the **economic loss doctrine** and must be dismissed as all of

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: 2002 WL 1335360 (Del.Super.))

Page 6

Christiana's alleged losses are purely economic in nature, *i.e.*, lost profits, lost investments, and acquired debt. Texaco also asserts that Christiana cannot employ the Restatement (Second) of Torts § 552, a state law exception to the economic loss doctrine, because federal maritime law governs this case, and maritime law does not permit exceptions to the economic loss doctrine. [FN33]

> FN33. The Court need not decide whether federal maritime law governs this action as Christiana's negligent misrepresentation will be dismissed on other grounds.

Christiana admits its damages are purely economic in nature, but contends (1) that the economic loss doctrine does not apply to its claims because the doctrine is applicable to torts under the products liability realm, i.e. when 'products' are involved; and (2) that even if the doctrine is applied to Christiana's claims, Delaware has adopted the Restatement (Second) of Torts § 552, an exception to the economic loss doctrine otherwise known as negligent misrepresentation. Christiana asserts it falls within this exception.

The economic loss doctrine "prohibits recovery in tort for losses unaccompanied by a bodily harm or a property damage." [FN34] The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. [FN35] Economic loss is "any monetary loss[ ], costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value ." [FN36] While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against the increasing amount of plaintiff's tort claims, which result when contract provisions limit their recoveries, or as in the instant case, where a contract may not have existed at all. While there appears to be no dispute that Christiana's damages are economic in nature, this fact alone does not necessarily result in the dismissal of the tort claim

> FN34. Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule*, 89 Ill. B.J. 406, 406-11 (2001) (discussing case law dealing with the economic loss doctrine,

future developments, and innocent fraud or negligent misrepresentation exclusion).

> FN35. *Danforth v. Acorn Structures,Inc.*, 608 A.2d 1194,1195 (Del.1992)(citing *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 448 (Ill.Supr.1982).

> FN36. Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule*, 89 Ill. B.J. at 406. *See also Danforth*, 608 A.2d at 1196(quoting *Moorman Mfg. Co.* 61 Ill.Dec. 746, 435 N.E.2d at 449)(noting that economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits--without any claim of personal injury or damage to other property.").

*6 The Restatement (Second) of Torts § 552 provides an exception to the economic loss doctrine's bright line rule and Delaware has explicitly adopted this exception in *Guardian Construction v. Tetra Tech Richardson*. [FN37] The Restatement provides that

> FN37. 583 A.2d 1378 (Del.Super.1990).

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Delaware's narrow application and strict construction of § 552, has thus far held that for a plaintiff to invoke a negligent misrepresentation cause of action, two elements are required. First, "the plaintiff must show that the defendant supplied the information to the plaintiff for use in business transactions with third parties." [FN38] Christiana has satisfied this element. When viewed in a light most favorable to Christiana, there is sufficient evidence, which would indicate that Texaco allegedly informed Christiana, on several occasions, that it intended to put through 200,000 bbls. of oil per month. Christiana relied upon that information to secure loans from FNBM, and incur significant debt to purchase additional tug

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00221-MPT    Document 8-3    Filed 10/04/2005    Page 8 of 10

Not Reported in A.2d                                                                                  Page 7
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: 2002 WL 1335360 (Del.Super.))

boats, barges, and equipment to transport Texaco's bunker oil. Thus, it appears that Christiana shared the information Texaco supplied to it, to use in its business transactions, the loans, with FNBM. Christiana as such, has satisfied the first prong of a negligent misrepresentation claim under § 552.

> FN38. *Danforth v. Acorn Structures, Inc.*, Del.Super. C.A. No. 90C-JN-30, Herlihy, J. (Nov. 22, 1991)(Mem.Op.)

As such, the focus of the Court's attention is on the second requirement for negligent misrepresentation. In *Danforth v. Acorn Structures Inc.*, [FN39] the Court, again adhering to Illinois precedent, held that a plaintiff, in addition to the first element mentioned above, must also show that "the defendant is in the business of supplying information." [FN40] In relying upon Illinois precedent, the *Danforth* court did not delineate which types of businesses are "in the business of supplying information" that would meet the Restatement's definition, but instead referred to the Illinois cases that made such determinations. [FN41]

> FN39. The first *Danforth* opinion granted the defendant's motion for summary judgment on the grounds that the plaintiff's claims were purely **economic losses** and were thus barred by the **economic loss doctrine**. *Danforth v. Acorn Structures Inc.*, C.A. No. 90C-JN-30, 1991 WL 215658 (Del.Super.Aug.27, 1991). Thereafter, the *Danforth* plaintiff filed a motion for reargument asserting his claims fell under the Restatement (Second) of Torts § 552 exception to the **economic loss doctrine**, and thus his negligent **misrepresentation** claim against the defendant should survive. *Danforth v. Acorn Structures, Inc.*, C.A. No. 90C-JN-30, 1991 WL 269956 (Del.Super.Nov.22, 1991). The Court's expansive discussion concerning the Restatement (Second) of Torts § 552, and the two requirements a plaintiff must satisfy to lift the **economic loss doctrine's** bar are found in the November 22, 1991 opinion.

> FN40. *Danforth v. Acorn Structures, Inc.*, Del.Super. C.A. No. 90C-JN-30, 1991 WL 269956, (Del.Super.Nov.22, 1991). Since *Danforth*, Illinois law has altered its requirements for a negligent misrepresentation claim: a plaintiff must now demonstrate that: "(1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings." *Tolan and Son, Inc. v. KLLM Architects, Inc.*, 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288, 296 (App.Ct.Ill.1999).

> FN41. *Danforth*, at *4 (citing *Rankow v. First Chicago Bank*, 870 F.2d 356, 360-366 (7th Cir.1989); *Gerdes v. John Hancock Mutual Life Insurance Co.*, 712 F.Supp. 692, 697-98(N.D.Ill.1989)).

In *Rankow v. First Chicago Corp.*, [FN42] the Seventh Circuit, reversing the District Court's decision, held that shareholders had sufficiently alleged negligent misrepresentation, noting that "[a] precise, case-specific inquiry is required to determine whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions." [FN43] The *Rankow* court went further to hold that "[w]hether [a defendant] can be held liable for negligent misrepresentation depends upon the nature of the information at issue in a particular case and its relation to the kind of business being conducted." [FN44] In its attempts to determine whether a bank was "in the business of supplying information" the *Rankow* court noted that while "there has been no clear discussion in the cases to date as to what principle should be applied in determining whether a party is in the business of supplying information" the lower court decisions have found that "manufacturers and sellers who deal only in tangible products are generally not in the business of supplying information." [FN45] The *Rankow* court then noted that

> FN42. 870 F.2d 356 (7th Cir.1989).

> FN43. *Rankow*, 870 F.2d at 360.

> FN44. *Rankow*, 870 F.2d at 361.

> FN45. Various Illinois cases, although not dispositive, are instructive in deciding whether a party is in the businesses of supplying information. *See e.g. Black, Jackson and Simmons Ins. Brokerage, Inc. v. Inter. Bus. Mach.*, 109 Ill.App.3d 132, 64 Ill.Dec. 730, 440 N.E.2d 282

Not Reported in A.2d  
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)  
(Cite as: 2002 WL 1335360 (Del.Super.))

Page 8

(Ill.App.Ct.1982)(holding a computer hardware and software supplier was not in the business of supplying information as a seller of merchandise); *Knox College v. Celotex, Corp.*, 117 Ill.App.3d 304, 72 Ill.Dec. 703, 453 N.E.2d 8 (Ill.App.Ct.1983)(holding a roofing materials supplier was not in the business of supplying information); *Tan v. Boyke*, 156 Ill.App.3d 49, 108 Ill.Dec. 229, 508 N.E.2d 390 (Ill.App.Ct.1987)(seller of an apartment building was not a supplier of information); *Vacuum Industrial Pollution*, 764 F.Supp. 507 (N.D.Ill.1991)(holding an oil company who negligently cleaned a tank that contained a chemical catalyst was not a supplier of information);.

*7 a great many businesses involve an exchange of information as well as of tangible products--manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, pecipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental. [FN46]

FN46. *Rankow*, 870 F.2d at 364.

In a more recent opinion, *Tolan and Son Inc. v. KLLM Architects, Inc.*, [FN47] the Illinois court noted that "a great many businesses exchange information as well as products" and "[w]here the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings." [FN48] The *Tolan* court further stated that "businesses that supply tangible goods and/or non-informational good or services ... may exchange information, [but] the information relates only to the goods or services and, thus, is "supplied incidental to the sale of the product." [FN49]

FN47. 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288 (Ill.App.3d 1999).

FN48. *Tolan Sons Inc.*, 241 Ill.Dec. 427, 719 N.E.2d at 296.

FN49. *Tolan*, 241 Ill.Dec. 427, 719 N.E.2d at 297.

The Court finds the above cited reasoning to be a fair interpretation of what it means to be "in the business of supplying information" for the purposes of a negligent misrepresentation claim. Based upon the above reasoning, and in heeding the prior precedent of *Guardian Construction*, and *Danforth*, the Court finds that Texaco was not "in the business of supplying information for the guidance of others." [FN50] The information Texaco supplied to Christiana is more aptly categorized as information incidentally supplied to Christiana for the ultimate service--that of transporting bunker fuel oil. Clearly, Texaco is generally in the business of supplying oil, not information. [FN51] The information Texaco supplied, if any, is best classified as ancillary to the provided service. [FN52] As such, this litigation will move forward as a contract dispute only and the tort claim is dismissed.

FN50. *See Tolan*, 241 Ill.Dec. 427, 719 N.E.2d at 296-96(delineating what business are pure information providers where the end product is an idea, what businesses are tangible product end manufacturers, and what businesses fall between the two.). *Tolan* notes that businesses such as accountants, lawyers, insurance brokers, stockbrokers, real estate brokers, and termite inspectors and environmental assessors are "pure information providers, which would constitute "in the business of supplying information for the guidance of others. *Tolan* also notes certain professions that are tangible good providers, which is where this Court finds Texaco falls--that of manufacturers of computers and software or products of any type.

FN51. *See Vacuum Industrial Pollution, Inc. v. Union Oil Co.*, 764 F.Supp. 507 (N.D.Ill.1991)(holding that a defendant oil company was not in the business of supplying information.).

FN52. *See* the Restatement (Second) of Torts § 552 comment a explaining that "by limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)
(Cite as: 2002 WL 1335360 (Del.Super.))

Page 9

the operation of the economy rests."

While this Court has followed the earlier decisions of the Court that have addressed this issue, other jurisdictions have taken a more expansive view of § 552 [FN53] and clearly an argument can be made that the decisions from Illinois followed by Delaware are too limiting and fail to give full effect to the negligent misrepresentation exception. The question of when does a business cross the line into the world of "supplying information" or whether that requirement is mandated, is anything but clear. If this matter reaches the Supreme Court it is suggested that they address these questions and provide clear direction to litigants and the Court to what is now murky waters.

FN53. See *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 762 A.2d 582 (Md.2000)(holding that the negligent misrepresentation requires: "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge hat the plaintiff will probably rely on the statement, which if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence."); *Jacobson v. Environmental Risk Limited*, No. CV 950550991, 1996 WL 168086, at *3 (Conn.Super.Mar.4, 1996)(following the "governing principals" of the Restatement (Second) of Torts § 552 and holding that negligent misrepresentation requires a plaintiff to "allege and prove that the reliance on the misstatement was justified or reasonable," and "reasonableness is a question of fact for the trier to determine based on all of the circumstances.")

*CONCLUSION*

For the reasons set forth above, Texaco's motion for summary judgment as to the **breach of contract** claim is denied, but Texaco's motion for summary judgment as to Christiana's negligent misrepresentation claims is granted.

Not Reported in A.2d, 2002 WL 1335360 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.